NANCY WEINSTEIN *v.* LUKE A. WEINSTEIN
(SC 17097)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued January 11—officially released October 4, 2005

674

*Lori Welch-Rubin*, with whom was *Susan Wolfson*, for the appellant (plaintiff).

*Karen L. Dowd*, with whom were *Kenneth J. Bartschi* and, on the brief, *Wesley W. Horton* and *Linda T. Douglas*, for the appellee (defendant).

*Gaetano Ferro* and *Norman A. Roberts II* filed a brief for the Connecticut Chapter of the American Academy of Matrimonial Lawyers as amicus curiae.

*Opinion*

KATZ, J. The plaintiff, Nancy Weinstein, appeals, following our grant of certification,[1] from the judgment of the Appellate Court, affirming the judgment of the trial court. *Weinstein* v. *Weinstein*, 79 Conn. App. 638, 830 A.2d 1134 (2003). The trial court had denied the plaintiff's application for a rule to show cause requesting that the court open and vacate the judgment dissolving her marriage to the defendant, Luke A. Weinstein, on the ground that the stipulation on which the judgment was based was the result of a fraudulent misrepresentation by the defendant. On appeal to this court, the plaintiff challenges the Appellate Court's conclusion that the trial court's findings, namely, that the plaintiff had failed to prove both that the defendant committed fraud by clear and convincing evidence and

---

[1] We granted the plaintiff's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the trial court's denial of the plaintiff's motion to open this marital dissolution judgment on the basis of fraud?" *Weinstein* v. *Weinstein*, 266 Conn. 933, 837 A.2d 807 (2003).

that there was a substantial likelihood that the result of a new trial would be different, were not clearly erroneous. Id., 648. Specifically, the plaintiff contends that she offered clear and convincing evidence that: (1) the defendant had committed fraud by failing to disclose a $2.5 million offer he and his business partners had received for the purchase of a software company that they owned during the pendency of the marriage dissolution proceedings; and (2) the defendant's rejection of that lucrative offer compelled the conclusion that the defendant fraudulently had undervalued his ownership interest in the company in his financial affidavit submitted to the court in the marriage dissolution proceedings. The plaintiff also contends that she established that there is a substantial likelihood that the outcome of a new trial would be different in light of the withheld and misrepresented information. We agree with the plaintiff, and, accordingly, we reverse the judgment of the Appellate Court.

The record reveals the following facts and procedural history. After nearly seven years of marriage and the birth of one child, the plaintiff filed a complaint seeking to dissolve her marriage due to an irretrievable breakdown. At the time of the dissolution proceedings, the defendant owned a substantial minority interest in a small, privately held software company, Product Technologies, Inc. (Product Technologies).[2] During the pendency of the matter, the plaintiff deposed the defendant, seeking specifically to obtain financial information about the value of his interest in the company. At trial before *Higgins, J.* (dissolution court), the plaintiff,

---

[2] Product Technologies manufactured financial software for Smart Card systems. Smart Cards are reusable plastic cards to which the user can add value, similar to credit cards that have a computer chip inside. Product Technologies produced the "turnkey" software that is used in Smart Cards using uniquely designed source codes. Thus, in addition to its profits from the manufacture and sale of the turnkey software, Product Technologies owned an intellectual property asset in the source codes.

through her expert witness, Kenneth J. Pia, Jr., submitted a report to the court containing Pia's valuation of the defendant's interest, which Pia had made on the basis of the financial information contained in the defendant's deposition, discovery and other representations, including the defendant's sworn financial affidavits in which he repeatedly had valued his interest at $40,000.[3] Subsequently, the parties stipulated to, and the dissolution court adopted, the $40,000 value for the defendant's interest in the company. On May 12, 1998, the dissolution court entered orders for, inter alia, child support and alimony. The court also ordered the defendant to pay to the plaintiff $100,000 as a property settlement. On the basis of the stipulated valuation of the defendant's interest in Product Technologies, the dissolution court allowed the defendant to retain that interest and the plaintiff to retain an inherited interest in a separate partnership owned by her family.

On May 29, 1998, the defendant filed a motion for reconsideration of the financial orders in the dissolution judgment, claiming that complying with the existing orders would "strip him bare" and force him to sell premarital assets. While that motion was pending, on June 12, 1998, the defendant received a memorandum of understanding from ICL, Inc. (ICL), a company with which Product Technologies jointly had developed certain software.[4] Although the memorandum of under-

---

[3] The defendant submitted a total of five affidavits to the dissolution court on: February 3, 1997; March 3, 1997; September 10, 1997; April 15, 1998; and April 17, 1998. A subsequent affidavit was faxed to the plaintiff on August 17, 1998. Each of the affidavits, with the exception of the ones produced on April 15, 1998, and August 17, 1998, valued the defendant's interest in Product Technologies at $40,000. The April 15, 1998 affidavit valued the defendant's interest at $14,000, and the August 17, 1998 affidavit listed the value as unknown.

[4] Although Product Technologies and ICL had operated at one time as friendly partners, the relationship soured sometime between 1997 and 1998. Between March and June, 1998, the companies were threatening each other with litigation over the intellectual property rights to the software.

standing did not set forth the finalized terms of the sale, it nonetheless clearly stated ICL's intent to purchase Product Technologies, stating: "This [memorandum of understanding] sets forth the intent of the parties that the Shareholders shall sell to ICL and ICL shall purchase from the Shareholders all of the issued and outstanding shares of [Product Technologies]. As such, the [Product Technologies] Business . . . shall be transferred to ICL *including, but not limited to, all intellectual property rights.* The term '[Product Technologies] Business' shall include, but is not limited to, [Product Technologies] operations as a smart card software developer and systems integration/solutions provider. More specifically, the [Product Technologies] Business includes, but is not limited to, the supply, both directly and through strategic relationships, of SmartCity system software, hardware, installation, customization, system integration, support and training. At ICL's election the Shares shall be sold to either ICL or to one or more of the companies within the ICL Group. The term 'ICL Group' means ICL's parent, affiliated and subsidiary companies." (Emphasis added.) On June 15, 1998, the defendant and his partners met with representatives from ICL, at which time ICL made an offer to purchase Product Technologies for $2.5 million. The defendant and his partners immediately rejected the offer, in part because they believed it was too low if ICL expected it to include the intellectual property asset. The defendant did not notify the plaintiff or the dissolution court that he had received and rejected this offer.

On June 16, 1998, the dissolution court denied the defendant's motion for reconsideration. In October, 1998, five months after the entry of the judgment of dissolution, the defendant and his partners sold Product Technologies to ICL for $6 million. As a result of the sale, the defendant received approximately $1.45 million for his interest in the company.

Thereafter, the plaintiff filed an application for a rule to show cause seeking to open and to vacate the judgment on the basis of fraud, asserting that the defendant fraudulently had failed to disclose and misrepresented material financial information during the pendency of the marital dissolution proceedings.[5] With respect to nondisclosure, the plaintiff claimed, inter alia, that the defendant's failure to disclose the $2.5 million offer constituted fraud. Specifically, the plaintiff contended that the defendant's duty to disclose pertinent financial information had extended until June 16, 1998, when the dissolution court ruled on the defendant's motion for reconsideration. The plaintiff asserted that the defendant had become aware of ICL's intent to purchase Product Technologies upon receipt of the memorandum of understanding on June 12, 1998, and that he had a duty to disclose the $2.5 million offer because the dissolution court had not yet ruled on his motion to reduce his financial obligations under the dissolution judgment due to monetary constraints.

With respect to misrepresentation, the plaintiff asserted, inter alia, that the defendant would not have considered the $2.5 million offer, which would have yielded the defendant approximately $500,000, to be too low unless Product Technologies and his interest therein were worth far more than the $40,000 that he had represented in his financial affidavit. Finally, the plaintiff contended that there was a substantial likelihood that the outcome of a new trial would be different in light of the withheld and misrepresented information.

The trial court, *Parker*, *J.*, denied the plaintiff's application for a rule to show cause, finding that the plaintiff had not proffered clear and convincing evidence that

---

[5] Although the application to open the judgment was filed more than four months from the date of dissolution; see Practice Book § 17-4 (a); a trial court has inherent power to determine if fraud exists. *Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d 837 (1980).

the defendant had committed fraud. With respect to the defendant's nondisclosure, although the dissolution court did not render judgment in the case until May 12, 1998, the trial court apparently concluded that the defendant's duty to disclose ended at the conclusion of the evidence, not upon the date on which judgment was rendered. The trial court found that, although the defendant had received an offer on June 15, 1998, "as of the time of the trial, April 16 and 17, 1998, there was no sale pending, no offer to purchase had been made, and no negotiations or discussions regarding [the] sale of [Product Technologies] had taken place." With respect to the defendant's allegedly fraudulent misrepresentation in his financial affidavit, the court declined to infer from the defendant's rejection of ICL's $2.5 million offer that Product Technologies was worth that amount or more. Because the trial court concluded that the plaintiff had failed to prove that the defendant engaged in fraudulent nondisclosure, and that the defendant's rejection of the $2.5 million offer did not establish clear and convincing evidence of fraud in his financial affidavit, the court did not address the plaintiff's claim that there was a substantial likelihood that the outcome of a new trial would be different in light of the $2.5 million offer and the defendant's rejection thereof. The trial court did, however, reach that issue with respect to a different nondisclosure claim asserted by the plaintiff; see footnote 7 of this opinion; but concluded that, even had the defendant violated his duty to disclose such information, there was not a substantial likelihood that the result of a new trial would be different.

The plaintiff filed a motion for reconsideration reasserting, inter alia, that the evidence reflected that the defendant had committed fraud because: (1) he received the sale offer before a final judgment had been rendered by virtue of the dissolution court's denial of

the defendant's motion for reconsideration; (2) the trial court acknowledged in its memorandum of decision that "[n]ecessarily, by filing the motion [for reconsideration], [the] defendant invited the plaintiff and the [dissolution] court to take another look at his financial condition"; and (3) the defendant therefore violated his duty to disclose the sale offer before final judgment had been rendered. The trial court denied the motion. In doing so, the court characterized the issue of whether the defendant's duty to disclose extended beyond the date of trial as outside the scope of the plaintiff's pleadings. The trial court further concluded that, in the absence of any appellate authority, it would not extend the duty to disclose beyond the trial and the rendering of judgment.

The plaintiff thereafter appealed to the Appellate Court, which affirmed the trial court's decision. Specifically, the Appellate Court concluded that the trial court properly could have credited the defendant's testimony that the subject of the sale of Product Technologies to ICL was not broached until June 15, 1998. *Weinstein* v. *Weinstein*, supra, 79 Conn. App. 641, 644. It did not address the plaintiff's claim regarding the extension of the defendant's continuing duty to disclose.[6] The

---

[6] The dissent suggests that, because the Appellate Court failed to address the plaintiff's claim regarding the defendant's continuing duty to disclose, we should presume that it did so because the plaintiff had failed to plead or to preserve the claim in the trial court. We note, however, that because the defendant objected to her raising this claim for this very reason, the Appellate Court likely would have relied on the defendant's objection as its reason for not reaching the claim. Instead, the Appellate Court's opinion is *silent* on the issue. That opinion similarly is silent with respect to the plaintiff's claims stemming from the valuation in the defendant's affidavit despite the fact that the dissent agrees that the "gravamen" of the plaintiff's claims stemmed from that affidavit. Thus, rather than presume that the Appellate Court's failure to address the plaintiff's continuing duty to disclose claim necessarily implies that it agreed with the defendant that the plaintiff failed to plead and to preserve the claim, an argument that we reject; see footnote 8 of this opinion; it is more reasonable to conclude that the Appellate Court simply overlooked that claim.

Appellate Court also failed to address the plaintiff's claim that the trial court improperly had concluded that the defendant had not misrepresented the value of his interest in his financial affidavit and specifically, that the defendant's rejection of the $2.5 million offer did not evidence such a misrepresentation. This certified appeal followed.

The plaintiff claims that she has satisfied her burden of proving that the defendant fraudulently had misrepresented his financial condition during the dissolution proceedings. Specifically, she asserts, inter alia,[7] that: (1) because the defendant's continuing duty to disclose necessarily extended to the date the dissolution court had ruled on his motion for reconsideration on June 16, 1998, the defendant was required to disclose his knowledge of ICL's intention to purchase Product Technologies, as reflected in the memorandum of understanding received on June 12, 1998, and the $2.5 million offer received on June 15, 1998; (2) the defendant deliberately withheld this material information; and (3) the $40,000 valuation the defendant placed on his ownership interest in Product Technologies was fraudulent in light of the defendant's rejection of the $2.5 million offer. The plaintiff further asserts that the dissolution court likely would have reached a different result if there had been a new trial because it would have divided the parties' assets differently, based either on the potential value of the defendant's interest subject to the pending sale or on the present value of the defendant's interest as reflected by the rejected $2.5 million offer.

---

[7] The plaintiff also has raised numerous other claims, including that the defendant: (1) fraudulently failed to disclose a material financial document, a private placement memorandum, that further evidenced the fraud in his financial affidavit; and (2) fraudulently concealed negotiations with ICL regarding the acquisition of Product Technologies that took place during the dissolution trial. Because our resolution of the plaintiff's claims regarding the $2.5 million offer is dispositive, we need not address these claims.

In response, the defendant contends that: (1) the $40,000 valuation in his affidavit was a reasonable assessment of the value of his interest in Product Technologies at that time given the company's dire financial state;[8] (2) the duty to disclose does not extend beyond the date the original judgment was rendered.[9] He further

[8] The defendant claims that we should not review the plaintiff's claim that he committed fraud in his financial affidavit by valuing his interest in Product Technologies at $40,000 because the plaintiff has raised that issue for the first time on appeal to this court. The defendant contends that the plaintiff's sole focus in the trial court and in the Appellate Court was on the issue of whether the defendant had committed fraud by failing to disclose the October, 1998 sale. We disagree. The plaintiff raised the issue of fraud in the defendant's affidavit in her rule to show cause application by referencing the $40,000 value therein and claiming that the defendant had misrepresented the worth of his business. See *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 587–88, 542 A.2d 1124 (1988) ("[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically" [internal quotation marks omitted]). The plaintiff also raised this claim in her memorandum of law filed in support of her rule to show cause application and asserted the claim at the hearing on her rule to show cause. Moreover, because the defendant failed to object in the lower courts to any of the plaintiff's claims stemming from the $40,000 valuation, he necessarily has waived the right to object to those claims before this court. See *DiLieto* v. *Better Homes Insulation Co.*, 16 Conn. App. 100, 104–105, 546 A.2d 957 (1988). For all of the foregoing reasons, we reject the defendant's claim.

[9] The defendant also contends, and the dissent concludes, that we should not address the plaintiff's claim regarding the extension of the continuing duty to disclose because the plaintiff did not plead this claim with specificity in her rule to show cause application and failed to preserve this claim at trial. These contentions are without merit. With respect to the pleadings, the plaintiff framed her rule to show cause application broadly enough to encompass this claim by asserting that the defendant improperly had failed to disclose an offer to purchase his business that he received during the "prolonged pendency" of the marriage dissolution proceedings. We will not penalize the plaintiff for not pleading, *to the letter*, claims that could not have been flushed out fully at the pleadings stage because they are based in part on information, such as the defendant's receipt and rejection of the $2.5 million offer on June 15, 1998, that, because of the defendant's conduct, she could not possibly have uncovered prior to discovery. Indeed, it is understandable that the plaintiff's pleadings focused primarily on the ultimate acquisition of Product Technologies for $6 million because that was all she knew about when she filed her rule to show cause application. Still, the plaintiff framed her rule to show cause broadly enough to encompass

claims that, even if it did, it would be unreasonable to

her claim with respect to the defendant's continuing duty to disclose, consistent with the evidence produced at the hearing, and it is extremely likely that the dissolution court would have granted the plaintiff leave to amend her pleadings had she requested permission. See *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 368–69 n.2, 525 A.2d 68 (1987) ("The defendants did not raise with any specificity any issue in the trial court as to the failure of the pleadings to conform to the proof; and such an issue need not be reviewed here. . . . Furthermore, it is extremely likely that the court would have granted a motion to amend the pleadings had [the plaintiff] so moved." [Citations omitted.]).

With respect to the preservation of her claim, at trial the plaintiff elicited evidence from the defendant in support of this claim and reasserted that claim in her closing argument, in her brief, and again in her motion for reconsideration of the trial court's decision. Specifically, in the facts section of her brief to the trial court, the plaintiff provided a time line of events. Three of those events included: the defendant's receipt of the $2.5 million offer on June 15, 1998; the defendant's argument that same day before the trial court on his motion for reconsideration of the dissolution judgment, claiming that the property settlement in the judgment would "strip him bare"; and the defendant's rejection two days later of the $2.5 million offer because it was too low. In the argument section of her brief, the plaintiff again referenced these three events and underscored the defendant's failure to disclose the $2.5 million offer. The plaintiff then stated with respect to these, as well as other actions by the defendant: "*All* of the foregoing representations by [the defendant] regarding his assets were known by [him] to be untrue. Moreover, these false representations were made in order to induce [the plaintiff] and the court to rely and act upon them, and both [the plaintiff] and the court did rely and act upon them." (Emphasis added.) Finally, the defendant hardly can contend that he was ambushed by the plaintiff's claim because in his closing argument in the trial court he acknowledged its presence in her brief and defended against that claim, raising the same arguments that he raises in his brief to this court. In addition to the excerpts in the transcript cited by the dissent, at closing, the defendant's counsel stated: "We filed a motion for reconsideration. If [the defendant] had thought ICL was going to come along and offer him a lot of money or any money, he would not have a filed a motion for reconsideration. It would have been ridiculous. And the fact that that motion was denied again strongly pushes that the date that we need to look at back to the time of the trial . . . ." When these remarks are read in concert with the remarks quoted by the dissent, it becomes clear that the defendant's counsel had recognized the nature of the plaintiff's claim and simply was arguing that the duty to disclose should not extend beyond the date of the trial.

In concluding that the plaintiff failed to plead and preserve this claim, the dissent assigns considerable weight to the fact that the trial court asked the plaintiff at the hearing if she would agree that, in order to prevail, she

require disclosure of an offer he received only one day before the dissolution court ruled on his motion for reconsideration. We agree with the plaintiff.

I

## STANDARD OF REVIEW AND GOVERNING PRECEDENT

Before addressing the merits of the plaintiff's claims, we set forth the standard for our review and the relevant legal principles. The party claiming fraud—in this case, the plaintiff—has the burden of proof. *Aksomitas* v. *Aksomitas*, 205 Conn. 93, 100, 529 A.2d 1314 (1987). Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous. *Miller* v. *Guimaraes*, 78 Conn. App. 760, 781, 829 A.2d 422 (2003). "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made."

would have to show that the seeds of the acquisition were planted during the dissolution trial itself. Specifically, the trial court stated: "I think what proffered my inquiry to you is . . . the last question . . . did you have discussions with ICL . . . after I think it was June 15 . . . about the acquisition. And in order for you to prevail, correct me if I'm wrong, don't you have to . . . show that the seeds, at least the seeds of this acquisition, were planted and well watered before the trial?" The plaintiff answered: "Yes, Your Honor. I do need to show that." In making this argument, the dissent overlooks one obvious fact. The trial court's question clearly referred to the plaintiff's claim regarding the defendant's failure to disclose the pending sale of Product Technologies. The plaintiff simply conceded that, in order to prevail on her claim that the defendant had committed fraud by concealing the pending acquisition of his company during the dissolution trial, she would have to prove that the seeds of the sale had been planted during the trial. The trial court's question and the plaintiff's concession have no bearing, however, on the plaintiff's other claims. Thus, we decline to conclude that *the plaintiff conceded that she had to prove that the seeds of the acquisition* were planted during the dissolution trial in order to prevail on *all* of the claims in her complaint, including those claims that stand independent of her claim regarding the acquisition.

(Internal quotation marks omitted.) *W.* v. *W.*, 256 Conn. 657, 661, 779 A.2d 716 (2001).

"Our review of a court's denial of a motion to open [based on fraud] is well settled. We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. . . . In an appeal from a denial of a motion to open a judgment, our review is limited to the issue of whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did. . . .

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . A marital judgment based upon a stipulation may be opened if the stipulation, and thus the judgment, was obtained by fraud. . . . A court's determinations as to the elements of fraud are findings of fact that we will not disturb unless they are clearly erroneous. . . .

"There are three limitations on a court's ability to grant relief from a dissolution judgment secured by fraud: (1) there must have been no laches or unreasonable delay by the injured party after the fraud was discovered; (2) there must be clear proof of the fraud; and (3) there is a substantial likelihood that the result of the new trial will be different." (Citations omitted;

internal quotation marks omitted.) *Mattson* v. *Mattson*, 74 Conn. App. 242, 244–46, 811 A.2d 256 (2002). Because there is no claim of undue delay in the present case, we limit our consideration to whether there was sufficient proof of fraud and whether the result in a new trial would differ.

To determine whether there was proof of fraud, we consider the evidence through the lens of our well settled policy regarding full and frank disclosure in marital dissolution actions. "Our [rules of practice have] long required that at the time a dissolution of marriage, legal separation or annulment action is claimed for a hearing, the moving party shall file a sworn statement . . . of current income, expenses, assets and liabilities, and pertinent records of employment, gross earnings, gross wages and all other income. . . . The opposing party is required to file a similar affidavit at least three days before the date of the hearing . . . .

"Our cases have uniformly emphasized the need for full and frank disclosure in that affidavit. A court is entitled to rely upon the truth and accuracy of sworn statements required by . . . the [rules of practice], and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. . . . These sworn statements have great significance in domestic disputes in that they serve to facilitate the process and avoid the necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence. . . .

"Moreover, in *Monroe* v. *Monroe*, [177 Conn. 173, 182, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979)], we referred to the requirement of full and frank disclosure between attorney and marital client. [L]awyers who represent clients in matrimonial dissolutions have a special responsibility for full

and fair disclosure, for a searching dialogue, about all of the facts that materially affect the client's rights and interests. Id., 183. In *Baker* v. *Baker*, 187 Conn. 315, 322, 445 A.2d 912 (1982), we imposed this requirement of honest disclosure between the litigating parties and the court. It is a logical extension of those precedents to require such full and frank disclosure as well between the marital litigants themselves. . . .

"We have recognized, furthermore, in the context of an action based upon fraud, that the special relationship between fiduciary and beneficiary compels full disclosure by the fiduciary. . . . Although marital parties are not necessarily in the relationship of fiduciary to beneficiary, we believe that no less disclosure is required of such parties when they come to court seeking to terminate their marriage.

"Finally, the principle of full and frank disclosure . . . is essential to our strong policy that the private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine. . . . That goal requires, in turn, that reasonable settlements have been knowingly agreed upon. . . . Our support of that goal will be effective only if we instill confidence in marital litigants that we require, as a concomitant of the settlement process, such full and frank disclosure from both sides, for then they will be more willing to [forgo] their combat and to settle their dispute privately, secure in the knowledge that they have all the essential information. . . . This principle will, in turn, decrease the need for extensive discovery, and will thereby help to preserve a greater measure of the often sorely tried marital assets for the support of all of the family members." (Citations omitted; internal quotation marks omitted.) *Billington* v. *Billington*, 220 Conn. 212, 219–22, 595 A.2d 1377 (1991).

## II

## EVIDENCE OF FRAUD

### A

### Misrepresentation in the Defendant's Financial Affidavit

We begin with the plaintiff's claim that the defendant committed fraud in his financial affidavit. In April, 1998, the defendant represented at the dissolution trial that Product Technologies was worth approximately $200,000. In his financial affidavit, the defendant repeatedly valued his interest in the company at $40,000. See footnote 3 of this opinion. Only two months later, on June 15, 1998, the defendant received and rejected ICL's $2.5 million purchase offer in part because he believed it was too low. A $2.5 million sale price for Product Technologies would have netted the defendant $500,000 for his interest alone. On June 17, the defendant authored a letter to ICL stating that their "low valuation of [Product Technologies]" was flawed because it failed to account for the intellectual property asset. At the hearing on the plaintiff's rule to show cause, the defendant was asked to explain what he meant in the June 17 letter:

"[The Plaintiff's Counsel]: [W]hat did you mean by the low valuation? That the $2.5 million was too low, is that what you meant?

"[The Defendant]: Yes."

The only logical conclusion one could draw from the defendant's stated belief that the $2.5 million offer was too low is that the defendant knew that Product Technologies and his interest therein were worth far more that he previously had represented in his financial affi-

davit during the dissolution trial.[10] At the hearing on the rule to show cause, the defendant testified that he based his valuation of Product Technologies and his interest therein on the book value of the company at that time. Although the defendant contends that his valuation was justified at the time given the book value[11]

[10] The dissent points to the defendant's statement at trial, in response to a question unrelated to his rejection of the $2.5 million offer, that he doubted the sincerity of the offer and believed it could be a ploy on ICL's part to gain access to Product Technologies' intellectual property secrets through due diligence review as evidence of another reason that the defendant could have rejected the offer. We find it difficult to conclude that the trial court reasonably could have credited this testimony. Two weeks after rejecting ICL's $2.5 million offer, ostensibly in part because of their concern about ICL's intent to use the due diligence review to obtain intellectual property secrets with no binding obligation to purchase the company, the defendant and William Mangino, Jr., the founder and a co-owner of Product Technologies, signed a nonbinding memorandum of understanding with ICL that subjected Product Technologies to the same due diligence review. In other words, the same risk existed, and the only substantive difference between the $2.5 million offer that the defendant rejected and the $6 million offer that the defendant accepted two weeks later was the higher price. Moreover, even if we were to assume, arguendo, that the trial court properly could have credited the defendant's statement regarding the sincerity of the offer as an alternate explanation for his rejecting it, it could not conclude that this was the sole reason for rejecting it as it is undisputed that the defendant testified that he believed that $2.5 million was too low a price if it included the intellectual property asset. In other words, the presence of evidence in the record that could suggest that this is not the *sole* reason that the defendant rejected the offer is *irrelevant* to our conclusion regarding the correlation between the defendant's admission that he thought the offer was too low and his valuation of the company during the dissolution trial. To be clear, our conclusion that the defendant knew that Product Technologies was worth more than he represented in his financial affidavit is not predicated simply on the fact that the defendant ultimately rejected the offer, as suggested by the dissent, but rather, it is founded on the defendant's admission that he did so because he believed the offer was too low.

[11] We accept, therefore, the defendant's uncontradicted testimony that Product Technologies had a minimal book value, but we reconcile that testimony with the other evidence, namely, the defendant's rejection of ICL's $2.5 million offer, by concluding that the book value logically could not have included the company's intellectual property asset. The dissent, however, concludes that the book value was the actual value of all of Product Technologies' assets without reconciling that conclusion with the defendant's rejection of the $2.5 million offer as too low.

of the company, the fact that the defendant based his valuation of Product Technologies *solely* on the company's book value simply means that his valuation patently was flawed for the same reason that he said ICL's $2.5 million valuation was flawed—it failed to account for the worth of the intellectual property asset.[12] Therefore, what we have in the present case is the dissolution of a marriage in which one party held a valuable asset, the true worth and nature of which only that party knew.

[12] The dissent suggests that because Pia was an expert in valuing businesses, he should have either independently assessed the worth of the intellectual property asset or asked more questions concerning its worth. The defendant, however, was best equipped to value that asset because he created it and knew its worth better than anyone else involved in the marriage dissolution proceedings. Additionally, Pia's valuation necessarily was limited by the information disclosed by the defendant. The defendant's duty to disclose fully and frankly required more than merely alluding to the fact that Product Technologies owned source codes; similarly, that duty was not met by his providing to Pia reams of documents in which information was buried that *might* have alerted Pia as to the asset's worth. See *Jackson* v. *Jackson*, 2 Conn. App. 179, 191, 478 A.2d 1026 (concluding that trial court's finding that plaintiff had not committed fraud in failing to disclose stock split to defendant because defendant easily could have ascertained number and value of plaintiff's shares from information in footnote in plaintiff's affidavit was clearly erroneous because it was not "a reasonable conclusion from the evidence unless the attorney examining the affidavit [had] been alerted to what he should look for"), cert. denied, 194 Conn. 805, 482 A.2d 710 (1984).

In order to comply with the requirement of full and frank disclosure, the defendant should have disclosed the fact that the company owned this asset and offered an *accurate* assessment of the asset's worth. See id., 190–91. To the extent that the defendant believed that Pia should discount the worth of the intellectual property asset because of the dispute with ICL over the rights to it, it was incumbent upon the defendant to explain that to Pia, rather than exclude altogether the worth of the asset from his valuation and his disclosures to the plaintiff. The dissent essentially makes a due diligence argument, namely, that the plaintiff and her expert did not dig deep enough to uncover the true worth of something the defendant had a duty to fully and frankly disclose. In *Billington*, however, we removed the due diligence inquiry from the fraud analysis in marital actions because "the requirement of diligence in discovering fraud is inconsistent with the requirement of full disclosure because it imposes on the innocent injured party the duty to discover that which the wrongdoer already is legally obligated to disclose." *Billington* v. *Billington*, supra, 220 Conn. 220.

Accordingly, in evaluating the trial court's decision, we must ask ourselves whether the trial court *reasonably* could have concluded that there was not clear and convincing evidence that: (1) a fiduciary would have had a duty to disclose the withheld information to a beneficiary; and (2) a fiduciary would have committed fraud in withholding that information from a beneficiary. See *Billington* v. *Billington*, supra, 220 Conn. 221; *Jackson* v. *Jackson*, 2 Conn. App. 179, 191, 478 A.2d 1026, cert. denied, 194 Conn. 805, 482 A.2d 710 (1984); see also *Anderson* v. *Anderson*, 822 A.2d 824, 829 (Pa. Super. 2003) ("The rules were intended to provide an even playing field for both parties in the marital and economic dissolution of the marriage. The rules should not and must not be used to play a game of 'gotcha.' "). When viewed through this lens, the defendant's conduct in excluding from his valuation the worth of an asset that Product Technologies had spent more than $1 million developing and was the "life blood" of the company reasonably can be viewed only as a blatant and deliberate misrepresentation.[13] See *Jackson* v. *Jackson*, supra, 195 ("[T]he plaintiff know-

[13] There is no question that the defendant believed that Product Technologies owned a valuable intellectual property asset, namely, the source codes for their Smart Card technology. See footnote 2 of this opinion. Indeed, the potential marketability of this asset formed the basis of a venture capital effort launched prior to the sale by the defendant and Mangino as a part of their plan to grow the company rapidly. Not surprisingly, the only document that evidenced the asset's potential, namely, the private placement memorandum on which the dissent relies, was withheld from the plaintiff during discovery. Although the dissent affords considerable weight to the defendant's stock sale to Mangino in January, 1997, this sale occurred eleven months *before* issuance of the first placement memorandum, a document clearly evidencing the defendant's belief that Product Technologies owned a valuable intellectual property asset and his strategy for developing that asset's potential, a strategy that may not have existed eleven months earlier. We further note that, although the dissent questions the inferences the majority has drawn from the defendant's conduct only *one month after the judgment of dissolution*, it nevertheless finds it reasonable to draw an inference from the defendant's conduct *eighteen months prior to the dissolution*.

ingly made an untrue representation. The representation was made to induce the defendant to act upon it. *That is the self-evident purpose of such affidavits.*" [Emphasis added.]).

Even if we were to assume, arguendo, that the defendant's valuation of Product Technologies during the dissolution trial included the worth of the intellectual property asset, his assessment that the $2.5 million offer was too low still equally serves as clear and convincing evidence that the valuation was a misrepresentation. If the defendant's valuation of $200,000 for the company had been an accurate assessment that included the worth of the intellectual property asset, then he could not have believed that ICL's $2.5 million valuation of the company was too low because it excluded the value of that asset.

In considering the defendant's suggestion that ICL was willing to spend an added premium in order to avoid litigation over the intellectual property rights to the jointly developed software and to gain a competitive advantage in the market, one must ask how much of a premium the trial court reasonably could have assumed that ICL would have been willing to pay for something that supposedly was worth only $200,000. Let us assume, for example, that the trial court determined that as much as 50 percent of the $2.5 million offer could have been a premium that ICL was willing to pay simply to avoid the cost and stress of litigation. It defies reason, however, to think that anyone would spend $1.25 million just to avoid litigation over something worth only $200,000. It would be equally implausible to think that anyone would be willing to pay an *additional* $1.25 million on top of the litigation premium for something worth so little. Similarly, ICL would not be willing to spend any more money to gain a competitive advantage in the market than it believed that it could make in the market once it had the intellectual property asset.

Product Technologies and ICL had developed this asset together, and no one knew its worth better than these two companies. Thus, ICL's $2.5 million offer constituted an independent appraisal of the worth of Product Technologies that the defendant himself labeled as "flawed" because it was too low.[14] Indeed, the huge disparity between the value that the defendant placed on Product Technologies in April, 1998, and the value that ICL placed on the company just two months later *compels* the conclusion that the defendant knew the company and his interest therein were worth more during the dissolution trial.[15] Therefore, the trial court *rea-*

[14] Although the dissent suggests that Pia's valuation of Product Technologies and the defendant's interest therein also could serve as an independent appraisal of the company, the dissent fails to recognize that Pia's valuation could not have been accurate in the absence of information essential to reaching a proper valuation, namely, the worth of the intellectual property asset. See footnote 12 of this opinion. The dissent's contention that this assertion is unsupported by the record is without merit. At the hearing on the motion to open, Pia testified that he had asked the defendant "very specifically" how he intended to go about growing Product Technologies. According to Pia, the defendant's *sole* response was that the company was trying to obtain bank financing. Pia expressly stated that "[n]othing else was described at that point in time." As previously noted; see footnote 12 of this opinion; under the holding in *Jackson* v. *Jackson,* supra, 2 Conn. App. 191, the fact that something might have been buried in the mass of documents that the defendant provided to Pia is insufficient to meet the defendant's disclosure obligations. The defendant had a duty to indicate clearly the value of the intellectual property asset. Rather than comply with this duty, the defendant failed to mention the asset and its potential for the company when Pia asked about his plans to grow the company and similarly failed to disclose the only document that evidenced the asset's potential and the defendant's efforts to grow the company by marketing the worth of this asset. See footnote 13 of this opinion.

[15] At the hearing on the plaintiff's rule to show cause, the defendant testified that there were certain events that occurred between April and June of 1998 that, in his opinion, significantly increased the value of Product Technologies. These events included a contract signed by one of their clients with "the largest credit card issuer in the world" that put Product Technologies' Smart Cards under that company's name with a Mastercard logo on them, and a 50 percent increase in the number of employees. Although the defendant initially claimed that he believed that these events only made Product Technologies' *appear* to be a successful company, when pressed further by the plaintiff, he later stated that he thought that these events

*sonably* could not have found a lack of correlation between the defendant's assessment of the $2.5 million offer as too low and his valuation of Product Technologies during the dissolution trial, and we are left with the "definite and firm conviction" that a mistake has been made.[16] See *State* v. *Michael J.*, 274 Conn. 321, 346, 875 A.2d 510 (2005) ("[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" [internal quotation marks omitted]). Accordingly, we conclude that the trial court's determination that the plaintiff failed to proffer clear and convincing evidence that the defendant knowingly had misrepresented his worth in his financial affidavit was clearly erroneous in light of the defendant's testimony regarding the $2.5 million offer. Because the trial court failed to conclude that the defendant had misrepresented his worth in his financial affidavit, the court did not address the question of whether such a misrepresentation would have been calculated to

"significantly change[d] its value . . . ." Giving every favorable presumption to the trial court's reading of the evidence, if the trial court had credited this testimony as a sufficient explanation for the gross disparity between the defendant's $200,000 valuation of Product Technologies in April, 1998, and ICL's $2.5 million offer in June, 1998, then it should have been obvious that the defendant essentially had admitted that he had reason to believe that the value of Product Technologies had increased dramatically during the pendency of the dissolution proceedings, a fact that he had failed to disclose to the plaintiff and the dissolution court. See part II B of this opinion. If the trial court had chosen to disbelieve this testimony, then there would have been no evidence left in the record to explain the drastic value increase over a two month period, other than that Product Technologies had been worth much more than the defendant had represented all along.

[16] We note that the Connecticut Chapter of the American Academy of Matrimonial Lawyers filed an amicus brief in support of the plaintiff's appeal and took the position that the Appellate Court and the trial court improperly failed to focus on whether the defendant's $40,000 valuation was reasonable in light of ICL's offer and ultimate purchase of Product Technologies indicating a significantly greater value.

deceive the plaintiff. In light of the evidence presented, however, we can glean no reason for the defendant's misrepresentation other than to induce the plaintiff to rely on the undervaluation in his affidavit to her detriment. See *Greger* v. *Greger*, 22 Conn. App. 596, 600, 578 A.2d 162 (concluding that trial court properly found that defendant's conduct was "deliberate, fraudulent and egregious concealment of assets" when defendant had represented in his affidavit that his closely held insurance business had no value although he knew, at time affidavit was filed, exactly how much he would be receiving from sale of business), cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990).

## B

### Nondisclosure as Further Misrepresentation

Although we already have concluded that the evidence proffered by the plaintiff regarding the defendant's valuation in his financial affidavit was sufficient to establish that the defendant had misrepresented his financial worth intentionally to deceive the plaintiff, we feel compelled to address the plaintiff's nondisclosure claim, as it further illuminates the defendant's continuing pattern of fraudulent conduct. The plaintiff contends that the defendant's duty to disclose pertinent financial information extended until the trial court rendered its decision on the defendant's motion for reconsideration of the dissolution judgment on June 16, 1998, and that the defendant, therefore, should have disclosed his knowledge of ICL's intent to purchase Product Technologies, notice of which he received on June 12, 1998, and ICL's $2.5 million offer, which was received on June 15, 1998.[17] The defendant contends that his duty

[17] The trial court found that "[t]he evidence is clear that ICL had not proposed, or even broached, an acquisition until June 15, 1998." That finding was clearly erroneous in light of the memorandum of understanding from ICL. The defendant contends that the trial court was entitled to believe the testimony of Mangino that the offer on June 15, 1998, came "[o]ut of the blue" and had not been contemplated by Product Technologies until that

to disclose such information did not extend beyond the judgment date of May 12, 1998, and that his motion for reconsideration, filed fourteen days later claiming that compliance with the order would "strip him bare" and force him to sell premarital assets, did not extend that duty. We agree with the plaintiff.

At the outset, we note that the trial court predicated its conclusion on the assumption that the defendant's continuing duty to disclose pertinent financial information expired at the close of the dissolution trial on April 17, 1998, rather than when judgment was rendered. "Whether the [defendant] had a duty to disclose is a question of law and, thus, our review [of the trial court's conclusion] is plenary." *Miller* v. *Guimaraes*, supra, 78 Conn. App. 776, citing *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 635–36, 804 A.2d 180 (2002). We conclude that the trial court's assumption was incorrect as a matter of law.

Practice Book § 13-15 imposes a continuing duty, during trial, to correct or supplement discovery responses.[18] With respect to dissolution proceedings,

date. Even if we were to accept the defendant's characterization of Mangino's testimony as accurate, the trial court properly could not have accepted that testimony over the plain language of the memorandum of understanding unequivocally stating ICL's intent to purchase Product Technologies. Similarly, the fact that the memorandum of understanding was not binding on ICL is irrelevant. Regardless of whether ICL was bound to purchase Product Technologies by the terms of the memorandum, that document clearly indicated ICL's intent to purchase Product Technologies, and while ICL could have renounced that intent, it never did so.

[18] Practice Book § 13-15 provides: "If, subsequent to compliance with any request or order for discovery and prior to or during trial, a party discovers additional or new material or information previously requested and ordered subject to discovery or inspection or discovers that the prior compliance was totally or partially incorrect or, though correct when made, is no longer true and the circumstances are such that a failure to amend the compliance is in substance a knowing concealment, that party shall promptly notify the other party, or the other party's attorney, and file and serve in accordance with Sections 10-12 through 10-17 a supplemental or corrected compliance."

In one of her interrogatories to the defendant, the plaintiff asked: "Has [Product Technologies] been approached, or any contacts made by any

this court has established that the value of the parties' assets must be determined as of the time the judgment of dissolution is rendered. See *Sunbury* v. *Sunbury*, 216 Conn. 673, 676, 583 A.2d 636 (1990) ("[i]n the absence of any exceptional intervening circumstances occurring in the meantime, [the] date of the granting of the divorce would be the proper time as of which to determine the value of the estate of the parties upon which to base the division of property" [internal quotation marks omitted]); see also 3 A. Rutkin, Family Law and Practice (2005) § 36.06 [1], pp. 36-22 through 36-23 ("Statutes in the vast majority of states set no definite date for valuation, although there are a few exceptions. Case law, therefore, governs in most jurisdictions. Numerous courts have held that assets should be valued as of the date of the decree. A significant number of courts have also decided that the proper valuation date for marital assets is the date of trial."). Therefore, it is clear that the duty to update pertinent discovery responses and to disclose facts relevant to that determination necessarily must extend until the judgment is rendered. Indeed, the sole purpose of disclosing pertinent financial information and mandating updated financial affidavits is to value the parties' assets properly, and it would completely thwart that purpose if the duty to disclose were to end before the asset valuation date. A treatise on family law explains why the later date serves an important function: "A separate, but critical, determination is the date selected for valuation of property to be distributed. The final award to a party may be significantly larger or smaller depending on the date chosen, especially if the parties' property consists of assets which fluctuate in value. Since the final divorce hearing

---

other groups concerning any transactions involving the sale and/or purchase of business interests?" The defendant replied: "[T]he answer is yes. *However, with the exception of information already disclosed during depositions, no offers have been made and no agreement in principle or otherwise has been contemplated, proposed, or made.*" (Emphasis added.)

often will be months or even years after the parties' final separation, a valuation date should be selected that will give the trial court the most current and accurate information possible, depending on the nature of the asset." 3 A. Rutkin, supra, § 36.06, p. 36-22. Indeed, extending the duty to disclose until the judgment is final essentially is mandated by our determination in *Billington* v. *Billington*, supra, 212 Conn. 220–22, wherein we underscored the necessity for full and frank disclosure in marital actions. See also Practice Book § 1-8 ("[t]he design of these rules [is] to facilitate business and advance justice, [and] they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice"). Thus, as our case law for the last fifteen years makes clear, the duty to disclose continued until the judgment of dissolution was final.[19]

In the present case, however, because the defendant filed a motion for reconsideration, the judgment ultimately did not become final until the dissolution court acted on his motion. We have recognized in an analogous context that the filing of a motion for reconsideration should be treated as suspending the finality of judgment when the effect of a ruling on the motion can affect the substantive rights of the parties.[20] See

---

[19] Although the dissent concedes that the proper date to value the parties' assets is the date of the dissolution, in this case May 12, 1998, it fails to address the defendant's testimony that he believed that the value of Product Technologies began increasing significantly prior to this date due to certain key events that he similarly failed to disclose to the plaintiff or to the dissolution court. See footnote 15 of this opinion.

[20] In *Killingly* v. *Connecticut Siting Council*, 220 Conn. 516, 525–27, 600 A.2d 752 (1991), we addressed the question of whether the filing of a motion for reconsideration of an agency's decision rendered the original judgment nonfinal until the decision on the motion for reconsideration was issued. In doing so, we expressed our approval of the rule followed by the federal courts, under which the agency retains jurisdiction, and thus a decision is not final, while the motion for reconsideration is pending. Id., 526. We declined to adopt a bright line rule, however, that would preclude the trial court from retaining jurisdiction over an administrative appeal that was filed within the original appeal period, but before the motion for reconsidera-

*Killingly* v. *Connecticut Siting Council*, 220 Conn. 516, 525–27, 600 A.2d 752 (1991); see also *Interstate Commerce Commission* v. *Brotherhood of Locomotive Engineers*, 482 U.S. 270, 284–85, 107 S. Ct. 2360, 96 L. Ed. 2d 222 (1987) (concluding that pending reconsideration had stayed appeal period and had rendered agency's original order "nonfinal" until decision on reconsideration was issued). Such a result is consistent with the rule that the filing of a motion that seeks an alteration, rather than a clarification, of the judgment suspends the appeal period. See Practice Book § 63-1 (c); *In re Haley B.*, 262 Conn. 406, 412–14, 815 A.2d 113 (2003) (concluding that motion for change in visitation order suspended appeal period). It also is consistent with our rules of practice governing appellate proceedings, which provide in relevant part that "[u]nless the chief justice or chief judge shall otherwise direct, any stay of proceedings which was in effect during the pendency of the appeal shall continue until the time for filing a motion for reconsideration has expired, and, if a motion is filed, until twenty days after its disposition, and, if it is granted, until the appeal is finally determined. . . ." Practice Book § 71-6.[21] Thus, under the facts and cir-

tion was filed and denied, because interests of fairness and judicial economy would weigh in favor of allowing the trial court to retain jurisdiction. Id.

The dissent's basis for criticizing our reliance on *Killingly* is unavailing. Although we stated in that case that a motion for reconsideration suspends the finality of the judgment when the ruling of the motion would "have redetermined the rights of the parties"; id., 521; the dissent contends that, because our holding was based on the importance of final judgments in the agency context, it is inapplicable in the marital dissolution setting. We fail to see the distinction. The importance of obtaining a final judgment when the lower ruling body is an agency applies with equal force when the lower ruling body is a trial court. "[T]he relevant considerations in determining finality are whether the process of . . . decisionmaking has reached a stage where [appellate] review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the [earlier] action." Id.

[21] This rule neither suggests nor allows for the finality of judgments to be extended indefinitely as the dissent suggests. A party only has twenty days from the date of judgment in which to file a motion for reconsideration.

cumstances of the present case, it is clear that the defendant's continuing duty to disclose information pertinent to valuing the parties' assets for distribution extended at least until June 16, 1998, when the dissolution court denied his motion for reconsideration of the dissolution judgment. Because the defendant's continuing duty to disclose extended through June 12, 1998, the defendant bore an obligation to inform the plaintiff and the dissolution court about ICL's intent to purchase Product Technologies. Similarly, the defendant had a duty to disclose ICL's $2.5 million purchase offer received on June 15, 1998.[22]

At oral argument before the dissolution court on his motion for reconsideration, the defendant contended that complying with the financial orders under the dissolution judgment would "strip him bare" and *force* him to sell premarital assets. Three days earlier, however, the defendant had received express notice of ICL's intent to purchase Product Technologies, and, on the day of the hearing on his motion, the defendant received the $2.5 million purchase offer. Indeed, the defendant must have *known* that he bore a duty to disclose this information because such a duty is *inherent* in the nature of the request he made before the court in his motion for reconsideration. "Common sense is not to be left at the courthouse door." *Meehan* v. *Meehan*, 40 Conn. App. 107, 113, 669 A.2d 616, cert. denied, 236

---

Practice Book § 11-12 (a). After the twenty days has passed, no such motions can be filed and the judgment becomes final. If, however, a motion for reconsideration on which the ruling could alter the judgment is filed within the twenty day period, it is only logical that the finality of the judgment be suspended until the court has ruled on that motion.

[22] The defendant contends that it would be unreasonable to require disclosure of an offer received only one day before the court rendered its decision. We disagree, particularly in light of the fact that the defendant knew three days prior to the June 15, 1998 meeting of ICL's intention to purchase Product Technologies. To accept the defendant's contention would be wholly inconsistent with the considerations we outlined in *Billington*. Full and frank disclosure means precisely that—*full and frank disclosure.*

Conn. 915, 673 A.2d 1142 (1996). This situation essentially is akin to the defendant going before the court and asking it to reduce his child support obligations because he was unemployed and could barely support himself, while concealing the fact that he had received a lucrative job offer that would pay him far more than he thought his services ever would be worth. In imploring the dissolution court to reduce his financial obligations to the plaintiff, the defendant necessarily reignited his duty to disclose *fully and frankly* any new financial information because such information was directly pertinent and material to the very issue the defendant was asking the court to reconsider. See *Duksa* v. *Middletown*, 173 Conn. 124, 127, 376 A.2d 1099 (1977) ("[a] party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak" [internal quotation marks omitted]). Such information certainly would include a purchase offer for, and a significant increase in value of, a marital asset. See footnote 15 of this opinion. It would defy logic and principles of fairness to allow the defendant to contest his financial ability to comply with the dissolution court's order by claiming financial hardship while simultaneously allowing him to withhold information expressly sought by the plaintiff as to the accurate value of and purchase offers for Product Technologies. Similarly, under the circumstances of this case, the evidence compels the conclusion that his nondisclosure of the $2.5 million purchase offer was calculated to deceive. See *Miller* v. *Appleby*, 183 Conn. 51, 57 n.1, 438 A.2d 811 (1981) ("when false representations are made for the purpose of inducing an act to another's injury, necessarily there is the plain implication that the representations were made with the intent to deceive").

## C

### Detrimental Reliance

It is undisputed that the plaintiff relied on the valuation in the defendant's affidavit when she agreed to

stipulate that his interest was worth only the $40,000 value listed therein.[23] Similarly, the dissolution court relied on the stipulated value in dividing the parties' assets. In light of these facts, it cannot be said that the misrepresentation in the defendant's affidavit was not material or that the plaintiff did not rely on it to her detriment. With respect to nondisclosure, it bears repeating that the reason the plaintiff is saddled with the burden of having to demonstrate fraud by clear and convincing evidence is because the defendant did not disclose timely material information that bore on the truthfulness of his financial affidavit. Had the defendant timely disclosed the $2.5 million offer instead of coming to court seeking its beneficence, the plaintiff would have been well within the four month period during which the plaintiff would have been permitted to file a motion to open the judgment, subject only to review as to whether the court acted unreasonably or in clear abuse of its discretion.[24] See *American Honda Finance Corp.* v. *Johnson*, 80 Conn. App. 164, 166, 834 A.2d 59 (2003). Instead, by failing to disclose material information that bore directly on financial orders the *defendant* asked the dissolution court to reconsider, he invited the court to scrutinize the value of a marital asset that he continued to misrepresent.[25] Thus, it can hardly be

---

[23] The dissent's suggestion that the plaintiff did not rely on the defendant's affidavit is contradicted by the record. Pia clearly stated that he had agreed to settle on a value of $40,000 in part because it was the value the defendant had placed on his interest in his affidavit. Moreover, Pia's valuation is not the issue in this case. Rather, the issue is whether the defendant failed to comply with his duty to fully, frankly, and *truthfully* disclose the worth of his interest in his affidavit.

[24] Indeed, because General Statutes § 51-183b allows a court to file its decision within 120 days of the date of the close of evidence, the appropriate question in a case like the present one is whether the trial court should be able to assume that it will be notified of any significant change in financial circumstances as soon as it occurs.

[25] In fact, both the trial court and the defendant recognized that, in filing his motion for reconsideration, the defendant necessarily invited the court to reexamine his financial situation. In his closing argument, the defendant's counsel stated: "We filed a motion for reconsideration. If [the defendant]

said that the defendant's failure to disclose the $2.5 million offer was not detrimental to the plaintiff, as it was the sole reason for the plaintiff's delay in discovering the defendant's misrepresentation in his financial affidavit. Accordingly, we conclude that the trial court improperly determined that the plaintiff had failed to establish the elements of fraud by clear and convincing evidence. See *Billington* v. *Billington*, 27 Conn. App. 466, 468, 606 A.2d 737 (concluding that trial court properly found that plaintiff had proven by clear and convincing evidence that defendant committed fraud when parties had agreed on property division of parcels of equal value and defendant represented in his affidavit that parcel he was to receive was worth $225,000 but failed to disclose that he already had received offer for $380,000 for parcel), cert. denied, 224 Conn. 906, 615 A.2d 1047 (1992).

## III

## SUBSTANTIAL LIKELIHOOD OF DIFFERENT OUTCOME

Finally, we turn to the issue of whether the plaintiff failed to proffer clear proof that there is a substantial

had thought ICL was going to come along and offer him a lot of money or any money, he would not have filed a motion for reconsideration. It would have been ridiculous." In its memorandum of decision, the trial court acknowledged: "Necessarily, by filing the motion, [the] defendant invited [the] plaintiff and the [dissolution] court to take another look at his financial condition . . . . If [the] defendant had known of the sale as early as the mid-April trial, its hard to believe he would have risked disclosure of the previously concealed sale by filing the motion for reconsideration/reargument; a risk inherent in the filing of the motion." In response to the query of why the defendant would invite the court to reexamine his assets under such circumstances, the obvious answer is that, because the defendant already had induced the plaintiff to stipulate to the undervaluation of his interest in Product Technologies, he had no reason to fear that the valuation would be disturbed by the dissolution court in ruling on his motion. Indeed, the only thing that would have prompted the plaintiff or that court to disturb the valuation that the parties already had stipulated to would have been the evidence that the defendant wilfully concealed.

likelihood that the outcome of a new trial would be different. The plaintiff contends that, in light of the true value of Product Technologies, the value of the parties' marital assets would have been significantly higher, thus, increasing her portion of the property settlement.

In its memorandum of decision, the trial court noted that the key questions involved in this inquiry were whether the plaintiff would have: (1) agreed to the $40,000 valuation of the defendant's interest in Product Technologies; (2) presented evidence that the value of the defendant's interest was greater than $40,000; and (3) been able to convince the trial court that the value was significantly greater than $40,000. We agree with the trial court's summary of the proof needed, but we disagree with its conclusion that the plaintiff failed to meet this burden.

We first note that, had the dissolution court known of the defendant's misrepresentation in his financial affidavit, it clearly would have viewed the defendant's credibility, and therefore his testimony, with far greater skepticism. Furthermore, in light of Product Technologies' drastically higher value than that attested to by the defendant, as evidenced by ICL's $2.5 million offer, we are left with the definite and firm conviction that the trial court should have concluded that there existed a substantial likelihood that the dissolution court would have made a different distribution of assets in the plaintiff's favor, either in the form of a direct payment or in shares of the defendant's company. The plaintiff need not prove what remedy the dissolution court would have adopted; just that the outcome likely would have differed.

We further conclude that, if the sale offer properly had been disclosed, it is substantially likely that the dissolution court would have granted, rather than denied, the defendant's motion for reconsideration of

the dissolution order, adopting any number of remedies in the interest of avoiding a miscarriage of justice to the plaintiff. See *Northeast Savings, F.A.* v. *Scherban*, 47 Conn. App. 225, 229–30, 702 A.2d 659 (1997) ("In any ordinary situation if a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is a serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided. *Hauser* v. *Fairfield*, 126 Conn. 240, 242, 10 A.2d 689 (1940). Whether or not a trial court will permit further evidence to be offered after the close of testimony in a case is a matter resting in the sound discretion of the court." [Internal quotation marks omitted.]), cert. denied, 244 Conn. 907, 714 A.2d 2 (1998); see also *Doyle* v. *Abbenante*, 89 Conn. App. 658, 665, 875 A.2d 558 (2005) ("[a]s a general matter, in the *absence of the discovery of some new facts* or new legal *authorities that could not have been presented earlier*, the denial of a motion for reargument is not an abuse of the discretion of the trial court" [emphasis added]). The extent to which it might have been difficult to assign a precise value to the potential future value of Product Technologies or only its intellectual property asset does not affect the outcome. The dissolution court could have addressed that issue by granting the plaintiff shares in the company. Indeed, it is not uncommon for dissolution courts to have to deal with assets with fluctuating values.[26]

---

[26] As one family law treatise explains: "The trend [in valuing marital assets] appears to be moving away from mandating a specific date for valuation and toward a flexible approach where the court has discretion to assign the date of valuation . . . . Even in jurisdictions that require or prefer that valuation be assigned as of a particular date, circumstances may require flexibility. If an asset at issue is one that is highly susceptible to fluctuations in value, authority should be located and arguments prepared to support utilization by the court of a valuation date most beneficial to the client." 2 A. Rutkin, Family Law and Practice (2005) § 13.04 [1] [b], p. 13-67. The valuation of a closely held business can be very difficult and numerous

The defendant disputes that the result of a new trial would be different because the plaintiff rejected an offer he had made during the dissolution proceedings to give her a share of his interest. Specifically, at the hearing on the motion to open the judgment, the defendant testified that he had offered the plaintiff a "tail" provision, meaning that he had been willing to give the plaintiff 20 to 30 percent of the proceeds of any sale of his interest in Product Technologies should one occur within a fixed period of time after the marital dissolution judgment.[27] The defendant apparently overlooks,

methods commonly are employed in doing so. Id., § 13.05 [2], p. 13-80. "In order to obtain the most accurate valuation for a small business, it is important to vigorously pursue discovery of all available data concerning the business, no just easy-to-obtain information. Discovery of only a financial statement or an inventory of assets *typically will not be sufficient.*" (Emphasis added.) Id. The factors that should be considered, as recommended by the Internal Revenue Service, would include assessing the value of an intellectual property asset. See id. (setting forth as relevant factors: "[1] [t]he nature of the business and the history of the enterprise from its inception; [2] *[t]he economic outlook in general and the outlook of the specific industry in particular;* [3] [t]he book value of the stock and the financial condition of the business; [4] *[t]he earning capacity of the company;* [5] [t]he dividend-paying capacity; [6] *[w]hether or not the enterprise has goodwill or other intangible value;* [and] [7] [s]ales of the stock and the size of the block of the stock to be valued" [emphasis added]).

[27] At the outset, we note that, according to Pia, it was he, and not the defendant, who had suggested the "tail" provision. Pia testified that the only reason he brought it up was because he had asked the defendant if he would be willing to consider it if the parties entered into a settlement agreement. We further note that the obvious answer to the dissent's query of why the defendant would have considered offering the plaintiff a "tail" if he knew that Product Technologies was worth millions is that he clearly had colored that offer by representing to the plaintiff that Product Technologies had virtually no future and no sale or investment prospects. Pia testified that he did not think the defendant's offer was an attractive one *based on the circumstances that the defendant had disclosed to him at that time.* Pia also testified that he had been given no reason to believe that there was going to be a sale of Product Technologies any time in the near future. These are precisely the kind of representations that the defendant had a continuing duty to correct during the pendency of the dissolution proceedings, and, if the defendant had complied with that duty, then there is a substantial likelihood that the plaintiff would have reconsidered whether to accept the tail provision.

however, that, at the time he made that offer, he had represented to the plaintiff that the future outlook for Product Technologies was bleak and that he had failed to disclose the company's actual worth including the value of its intellectual property asset. Thus, the plaintiff's rejection of the defendant's offer of an interest that the defendant essentially asserted had little to no value does not bear on whether she would have reacted differently had the true picture been disclosed.

In sum, it was undisputed that Product Technologies was developed during the parties' marriage, that marital assets were invested in the company and that the defendant's interest in Product Technologies was a marital asset. Thus, had the dissolution court been aware that this asset was worth *significantly* more than the defendant had represented, it is substantially likely that the court ultimately would have entered a different award with respect to the division of the parties' assets. See *Kinderman* v. *Kinderman*, 19 Conn. App. 534, 538, 562 A.2d 1151 ("[w]e have no trouble concluding that the $132,000 difference in valuation [of the marital residence] in this case is sizeable"), cert. denied, 212 Conn. 817, 565 A.2d 535 (1989); *Cuneo* v. *Cuneo*, 12 Conn. App. 702, 710, 533 A.2d 1226 (1989) (holding that increase in value of marital residence from $40,000 to $60,000 was sizable difference). Accordingly, we conclude that, had the trial court reached this issue, it would have been compelled to conclude that the plaintiff proffered clear proof of a substantial likelihood that the outcome of a new trial would yield a different result. See *Jackson* v. *Jackson*, supra, 2 Conn. App. 195 ("[c]onsidering all of the statutory criteria for distribution of assets and for alimony in a dissolution action; General Statutes §§ 46b-81, 46b-82; we conclude that it is highly likely that a new trial, with all of the cards on the table, will produce a different result").

In sum, we are well aware of our limited role in reviewing the factual findings of the trial court under the clearly erroneous standard. The trier of fact has wide discretion in interpreting the evidence and drawing conclusions therefrom. *Jackson* v. *Jackson*, supra, 2 Conn. App. 195. When "a clear case is made under applicable law that a fraudulent and material misrepresentation by one party resulted in a substantial injustice to the other party, [however] we must not hesitate to act. This is such a case."[28] Id., 196.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court with direction to grant the motion to open the judgment of dissolution and for further proceedings according to law.

In this opinion BORDEN and NORCOTT, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, dissenting. The majority today reverses the judgment of the Appellate Court and concludes that the plaintiff, Nancy Weinstein, has proved by clear and convincing evidence that the defendant, Luke A. Weinstein, had

---

[28] Finally, the dissent harkens that, as a result of this opinion, there will be mass confusion among the family bench and bar and far more dissatisfied marital litigants. We disagree. The result of this case essentially is no different than any other reversal of judgment in a dissolution action requiring a new trial, affording the trial court enormous discretion, as to valuation and division of the marital assets and other attendant financial orders. Furthermore, the result in this case places responsibility where it belongs, on the party who wrongfully withheld information, not on the matrimonial bar otherwise likely to face malpractice complaints that would result from the dissent's allocation of blame. See *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 174–77, 646 A.2d 195 (1994) (upholding liability of wife's trial counsel following Appellate Court's judgment affirming decision by trial court denying her motion to open dissolution judgment based on husband's fraudulent affidavit).

defrauded her in two ways. First, the majority concludes the defendant committed fraud in his financial affidavit when he valued his 19.4 percent interest in Product Technologies, Inc. (Product Technologies), at $40,000 on April 17, 1998, the date of the close of the dissolution trial. That is so, the majority holds, because the defendant did not include the value of the software that Product Technologies owned in his $40,000 estimate or, alternatively, because the defendant's assessment of the June 15, 1998 offer of $2.5 million by ICL, Inc. (ICL), to purchase Product Technologies as "too low" proves that he knew, during the dissolution proceedings, that the company and his interest therein were worth far more than he represented. Second, the majority concludes that the defendant had a continuing duty to disclose the $2.5 million offer, and that his failure to make that disclosure constituted fraud in its own right. I disagree with the majority's conclusions and, accordingly, I respectfully dissent.

I begin this dissent in part I with an expanded rendition of the facts in order to place the majority opinion in its proper light and to set the backdrop for my analysis. In part II, I turn my attention to the majority's holding that the defendant committed fraud in his affidavit. I first conclude that the plaintiff has not proved by clear and convincing evidence that the defendant did not include what he perceived to be the worth of the software in his $40,000 estimate. I then review the trial court's finding that the defendant's characterization of the $2.5 million offer as too low had no correlation to his knowledge of the company's worth during the dissolution proceedings. Unlike the majority, I conclude that the court's finding is amply supported by the evidence. I explain that the majority, in rejecting this specific finding and the trial court's overall finding that the defendant did not fraudulently misrepresent the worth of his interest, departs from the deferential standard

that long has guided our review of factual findings. Specifically, I observe that the majority: (1) affords no weight to the trial court's findings; (2) does not consider the evidence as a whole and does not apply every reasonable presumption in favor of those findings but, rather, considers only selected pieces of evidence; and (3) adopts the plaintiff's speculative inferences and substitutes them for the contrary and well supported findings of the trial court.

In part III, I review the majority's reasoning with respect to the plaintiff's second claim, namely, that the defendant's nondisclosure of the $2.5 million offer constituted fraud in its own right. I begin in part III A with a review of the majority's conclusion that the defendant was obligated to inform the plaintiff of that offer because his duty to disclose continued until June 16, 1998, the date on which the dissolution court denied the defendant's motion for reconsideration of its financial orders. I reject the majority's new continuing disclosure rule because, in my opinion, it finds no support in the law and it directly contravenes the provisions of Practice Book § 13-15. Because the rules of practice expressly provide that a party's duty to disclose continues only through the conclusion of the trial; see Practice Book § 13-15; and the majority does not have the authority to modify that rule, I would hold that the defendant had no duty to disclose the offer. I note in part III B, however, that, even if the majority's new continuing disclosure rule could somehow be deemed valid, the defendant's failure to conform to it cannot support a finding of fraud because he could not possibly have known of its existence in light of the fact that it was first announced today. Finally, in part III C, I briefly review the defendant's alternative grounds for affirming the judgment of the Appellate Court because, in my view, they illustrate just how grossly unfair the majority opinion is to the defendant, the trial court and the Appel-

late Court, principally because the plaintiff never raised her continuing duty to disclose claim at trial.

## I

## The Facts

I begin my restatement of the facts with some background information about Product Technologies. Prior to its acquisition by ICL on October 1, 1998, Product Technologies was a small entrepreneurial business[1] that originally was founded in 1993 by William Mangino, Jr., to develop and to license Smart Card system software.[2] The defendant joined Product Technologies as an employee and shareholder shortly after its formation and contributed approximately $10,000 to acquire an ownership interest in the company. In 1996, two investors from Russia also became minority shareholders in the company.

Because Product Technologies was severely undercapitalized, the shareholders decided "to try and grow the company as rapidly as possible, and either succeed quickly or die quickly." In order to pursue that strategy, the defendant and Mangino determined that they needed at least $5 million in new capital "to survive . . . ." In May, 1997, the company prepared its first private placement memorandum in an attempt to raise that capital from private investors.

The placement memorandum characterized the market for Smart Card products in 1997 as one involving "an increasing number of market entrants who have developed or are developing a wide variety of products." Despite the uncertainty in that market, the memo-

---

[1] The defendant testified at the dissolution trial that Product Technologies had ten full-time employees and one part-time employee.

[2] See footnote 2 of the majority opinion for a description of "Smart Cards" and the particular software that Product Technologies developed in connection therewith.

randum indicated that Product Technologies' flagship product, which was known as "SmartCity," was a unique product in that it was "sufficiently flexible to meet [the] demands of various [S]mart [C]ard applications, unlike competing products which must be customized to the application." It also stated, however, that Product Technologies faced serious impediments to market acceptance of its products, most notably a reluctance by potential customers "to integrate the [c]ompany's [S]mart [C]ard products into their systems unless the products [were] proven to be both reliable and available at a competitive price in an assured quantity."

The memorandum further revealed that Product Technologies' chief competitors were "subsidiaries of multinational companies and independent firms with established [S]mart [C]ard businesses who have longer operating histories, greater name recognition, larger customer bases and significantly greater financial, technical and marketing resources . . . ." These competitors included, among others, American Express, International Business Machines or IBM, MasterCard International, Schlumberger Limited and Visa International. With respect to Product Technologies' finances, the memorandum disclosed that, in 1996, the company reported net income of $266,544. As of December 31, 1996, the company's working capital was $195,773, and stockholder's equity totaled $252,319.

In January, 1997, the defendant sold slightly less than one half of his shares to Mangino. In return, the defendant received $5000 and a $1000 increase in his monthly salary. Fourteen months later, in March, 1998, Product Technologies issued a revised placement memorandum that incorporated the company's financial results for 1997. During that year, working capital declined from a positive balance of $195,773 to a *deficit* of $58,152, while net income was only $18,673 for the entire year. As of December 31, 1997, stockholders' equity totaled

$25,031, marking an annual decline of $227,288. Thus, there can be no question that, as of December 31, 1997, the company faced stiff, if not insurmountable, competition, its finances were spiraling downward and, in fact, it rapidly was approaching insolvency.[3] In addition, the placement memoranda had not lured even one investor.

Product Technologies' future was rendered even more tenuous in the spring of 1998, when ICL, which had partnered with Product Technologies to develop certain components of the SmartCity software, claimed that it owned the intellectual property rights to that software. On March 25, 1998, ICL terminated the parties' software licensing agreement and announced that it was "coming" to the United States[4] to compete with Product Technologies using the SmartCity system. At the hearing on the plaintiff's request to open the judgment of dissolution (motion to open), the defendant explained that ICL's claim to the software encumbered Product Technologies with an "anchor" because no other company would be willing to invest in Product Technologies until that claim was resolved. Similarly, Dennis Rusconi, an investment banker, testified that Product Technologies "would have been a very difficult company to sell if there were any litigation or any threatened litigation going on at the time." Thus, in the spring of 1998, Product Technologies' future was highly uncertain. Indeed, it was that uncertainty that rendered the defendant's interest in the company so difficult to value.

During the dissolution proceedings, Kenneth J. Pia, Jr., the plaintiff's financial expert, independently appraised the value of Product Technologies and the defendant's 19.4 percent interest therein. At the hearing

---

[3] As of December 31, 1997, the company had outstanding liabilities of $484,232, while assets totaled only $499,960.

[4] The placement memorandum stated that ICL "is a $4.5 billion majority owned subsidiary of Fujitsu Limited of Japan . . . [and] is a major player in the European financial services marketplace."

on the motion to open, Pia explained that he used information that he had gleaned from his interview with the defendant, along with more than a "trunk load" of documents that the defendant had provided to him, in order to perform his appraisal. He applied three different valuation techniques, which collectively revealed that the defendant's interest in Product Technologies was worth between $35,000 and $68,000 as of the dissolution proceedings. Pia fixed his final estimate at $40,000 because it fell between the ranges of values generated by his models and was consistent with the value that the defendant had estimated. The plaintiff and the defendant stipulated to Pia's $40,000 valuation during the dissolution proceedings, and the defendant reported that value on his final affidavit. Thus, the majority's assertion "that the plaintiff relied on the valuation in the defendant's affidavit when she agreed to stipulate that his interest was worth only the $40,000 value listed therein" simply is not true. To the contrary, the plaintiff relied on the valuation performed by her own expert.

On May 12, 1998, the court, *Higgins, J.,* dissolved the marriage of the plaintiff and the defendant and issued financial orders in connection with the dissolution. The court ordered the defendant to pay to the plaintiff a property settlement of $100,000, alimony in the amount of $1000 per month and child support in the amount stipulated to by the parties. The judgment also provided that the defendant would retain his interest in Product Technologies and the plaintiff would retain her interest in a real estate partnership that was formed by her family.

On May 26, 1998, the defendant filed a motion for reconsideration in which he alleged that the aforementioned financial orders were inconsistent with the court's intentions, as expressed during the dissolution proceedings, namely, that the court was going to allow

the defendant "to keep his assets as they are" and that it was not going to "strip him bare, giving it all to her . . . ." (Internal quotation marks omitted.) In that motion, the defendant alleged that the court's financial orders were inconsistent with the court's stated goals because the orders required him to dispose of premarital assets, and "[t]he court-ordered payments [would] leave the defendant with less than $1000 per month . . . to support himself and his daughter, whom he has with him 50 percent of the time."

On June 12, 1998, while the motion for reconsideration was pending, Product Technologies received an unsigned memorandum of understanding from ICL. Although ICL expressed its intent to purchase all of the outstanding stock of Product Technologies, the memorandum contained *no purchase price or other financial terms*. The memorandum did, however, include the following clause: "*Statements of intent or understandings in this [memorandum] shall not be deemed to constitute any offer, acceptance or legally binding agreement and do not create any rights or obligations for or on the part of any party to this [memorandum]*." (Emphasis added.) The memorandum further provided that ICL would have an opportunity to perform a due diligence review of the business and financial condition of Product Technologies prior to its agreement to purchase the company. The defendant and his business partners did not respond to the memorandum.

On June 15, 1998, the dissolution court heard oral arguments from the parties without the presence of the defendant, regarding his motion for reconsideration of the court's financial orders. On that same day, Mangino and the defendant attended a meeting with representatives from ICL at which those representatives made an

oral offer[5] to purchase Product Technologies for $2.5 million.[6] Both the defendant and Mangino were surprised that ICL expressed an interest in acquiring Product Technologies because they thought that the two companies were "go[ing] to court . . . ." The defendant and Mangino immediately declined the offer because they believed that it was a ploy to gain information about the SmartCity software, presumably under the guise of a due diligence review. The defendant described the events of that meeting at the hearing on the plaintiff's motion to open. He stated that the meeting lasted approximately forty-five minutes and "ended in a huff." He further explained that ICL's representatives "were fairly angry that [the defendant and Mangino] wouldn't negotiate, counteroffer, whatever, but [he] believed that there wasn't a lot of sincerity behind it . . . [and] [t]hat [ICL was] looking to find information, and [he] thought [ICL was] a competitor."

On the next day, June 16, 1998, two events occurred. First, the dissolution court denied the defendant's motion for reconsideration. Second, Mangino and the defendant received a letter from Alan P. Wain, ICL's vice president and general counsel, in which Wain maintained that the intellectual property rights to the SmartCity software were "held and shared equally by the parties." Although Wain expressed ICL's hope that an acquisition would still occur, he also articulated ICL's expectations and intentions if it did not. In particu-

---

[5] Throughout this opinion, I refer to ICL's $2.5 million preliminary sales price as an "offer." I note, however, that the June 12, 1998 memorandum of understanding makes clear that the establishment of a preliminary sales price does not *constitute any offer, acceptance or legally binding agreement and [does] not create any rights or obligations for or on the part of any party . . . .*" (Emphasis added.) Thus, the $2.5 million offer is not an "offer," as that term is commonly used.

[6] The record does not indicate the time of day that the June 15, 1998 meeting occurred. Nor does it indicate whether the defendant knew that his attorney would be arguing his motion for reconsideration on that day.

lar, Wain wrote: "[I]f we are unable to conclude the acquisition, we expect that you will deliver to us a complete copy of all of the code[s], including source code[s], and all of the documentation. If you fail to do so, we will have no choice but to pursue our legal remedies."

On June 17, 1998, the defendant wrote a letter to Wain on behalf of Product Technologies. In that letter, the defendant stated that Wain's position that ICL owned equal rights to the SmartCity software was flawed. That was so, the defendant wrote, because Product Technologies solely had developed many enhancements to SmartCity that fell outside of the purview of the parties' agreement. The defendant further wrote that Product Technologies "would vigorously protect its rights under [the agreement] and would seek to recover damages [that Product Technologies] incurs as a result of any claim against it." Finally, the defendant closed the letter with the following passage: "[Product Technologies] management clearly understood at the meetings on [June 15, 1998] that your position on [the intellectual property rights] is a major factor in the low valuation of [Product Technologies]. If this position is seriously flawed, then so is the valuation."

Thereafter, additional discussions between Product Technologies and ICL ensued and, on July 1, 1998, the parties signed a nonbinding memorandum of understanding setting forth ICL's intent to acquire Product Technologies for $6 million, subject to a favorable due diligence review. On October 1, 1998, the parties signed an acquisition agreement and the sale was consummated. ICL's decision to acquire the company was precipitated by its desire to develop a Smart Card business, its view that the SmartCity software would fit optimally with its overall Smart Card strategy and its eagerness to resolve the dispute over the ownership of the intellec-

tual property rights. Additional facts will be set forth as necessary.

## II

### Fraud in the Defendant's Financial Affidavit

The majority's conclusion that the defendant committed fraud in his financial affidavit rests on two alternate grounds. First, according to the majority, the $40,000 estimate that the defendant assigned to his business interest did not include the worth of the software that Product Technologies owned and, therefore, it was a "blatant and deliberate misrepresentation." Second, the majority posits that, even if the defendant did include the worth of the software in his $40,000 estimate, the statement that he made in his June 17, 1998 letter to Wain, namely, that the $2.5 million offer was too low, is equally convincing proof that he knew his shares in Product Technologies were worth far more than $40,000 on April 17, 1998. In so holding, the majority rejects the trial court's determination that the plaintiff did not prove by clear and convincing evidence that the defendant fraudulently had misrepresented the worth of his interest, and concludes that it is left with the "definite and firm conviction" that the trial court made a mistake. (Internal quotation marks omitted.)

Before I analyze the majority's reasoning as it pertains to the plaintiff's first claim, I set forth the highly deferential standard that long has guided our review of a trial court's factual findings. It is well settled that "[w]e will overturn . . . a finding of fact only if it is clearly erroneous in light of *the evidence in the whole record.*" (Emphasis added; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 705, 741 A.2d 873 (1999). A court's factual finding "is clearly erroneous only in cases in which the record contains *no evidence* to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm convic-

tion that a *mistake* has been made." (Emphasis added; internal quotation marks omitted.) *W.* v. *W.*, 256 Conn. 657, 661, 779 A.2d 716 (2001). When we review factual findings, we afford "[*g*]*reat weight* . . . to the judgment of the trial court because of [its] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached." (Emphasis added; internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 397, 852 A.2d 643 (2004). Nor do we substitute a party's "speculative inferences . . . for the contrary finding[s] of the trial court." *State* v. *Michael J.*, 274 Conn. 321, 347, 875 A.2d 510 (2005). We do, however, make "*every reasonable presumption*" in favor of the trial court's finding. (Emphasis added; internal quotation marks omitted.) *In re Jeisean M.*, supra, 397.

My analysis will reveal that the majority violates virtually every one of the foregoing principles. First, the majority affords no weight to the trial court's findings and makes no presumption in their favor. Second, the majority does not review the evidence of the record as a whole but, rather, confines its review to selected pieces of evidence and draws inferences therefrom that are undermined by other evidence in the record. Finally, the majority essentially adopts the plaintiff's speculative inferences and substitutes them for the contrary and well supported findings of the trial court.

A

Exclusion of the Worth of the Software
from the $40,000 Estimate

The plaintiff first contends, and the majority agrees, that she has proved by clear and convincing evidence that the defendant did not include the worth of the software in the $40,000 estimate contained in his affidavit. The majority concludes that this misrepresentation

automatically supports a finding of fraud, apparently under the principles announced in *Billington* v. *Billington*, 220 Conn. 212, 219–22, 595 A.2d 1377 (1991). I would reach a different result. Specifically, I would hold that the evidence, when viewed as a whole, does not provide clear and convincing proof that the defendant did not include the worth of the software in his affidavit. I therefore would reject the plaintiff's claim.

The majority's determination that the defendant's affidavit did not include the worth of the software rests entirely on the defendant's testimony that his $40,000 estimate was based on the "book value" of Product Technologies. It is from this isolated statement that the majority concludes that the financial affidavit contained a "blatant and deliberate misrepresentation." I note, however, that the defendant did not explain what he thought "book value" meant but simply stated that $40,000 was a "guesstimate" of what he would receive "if [Product Technologies] got distributed and broken up at the time." The plaintiff's counsel did not ask the defendant to explain the term "book value," nor did she ask him to articulate the specific assets and liabilities that formed the basis of his estimate. Most importantly, the plaintiff's counsel did not ask the defendant whether his estimate included what he perceived to be the worth of the SmartCity software on April 17, 1998. Thus, the plaintiff's claim and the majority's determination are premised exclusively on the unproven assumption that the defendant defined "book value" in a manner consistent with the exclusion of intangible assets such as intellectual property rights. That assumption is flawed.

The placement memorandum that Product Technologies issued in March, 1998, shows that the actual book value of the entire company was only $25,031, which

is $174,969 lower than the $200,000[7] value that the defendant assigned to the company at large. Similarly, the memorandum reported that the book value[8] for each of the 23,450 outstanding common shares was $1.07. In view of the fact that the defendant owned 4550 common shares, the memorandum indicates that the actual book value of his 19.4 percent interest was only $4868.50, or $35,131.50 less than the $40,000 estimate that he had reported in his affidavit. In short, the placement memorandum makes clear that the defendant's meaning of "book value" differed from the generally accepted accounting definition of that term. Thus, the majority's reliance on the defendant's testimony that he used "book value" as support for its determination that he did not include the worth of the software in his affidavit is tantamount to its reliance on no evidence at all.[9]

The majority's determination also is undermined by the valuation performed by Pia, the plaintiff's expert. Pia explained that he performed a comprehensive analysis of the value of Product Technologies and arrived at a value for the defendant's shares that was comparable to the $40,000 estimate that the defendant had reported. Surely Pia, who has evaluated or appraised more than 300 companies in a broad range of industries, would have included the worth of the software in his

---

[7] This number is obtained by dividing the $40,000 estimate reported on the defendant's affidavit by the 19.4 percent interest that the defendant owned in the company, and rounding the quotient to $200,000.

[8] The placement memorandum defined book value per share as "the total amount of assets less total liabilities, divided by the number of Share[s] of Common Stock outstanding . . . ."

[9] Indeed, the majority admits as much when it states: "We recognize the testimony that the book value of Product Technologies was extremely low . . . ." Footnote 11 of the majority opinion. In that same footnote, the majority also contends that I do not explain how the defendant could have thought that ICL's $2.5 million offer was too low unless the defendant believed that the value of the software could yield a higher price. I do address that issue in the text of this opinion.

appraisal.[10] There certainly is no evidence in the record that he did not. In fact, the record reveals that Pia specifically inquired about the intellectual property rights during his interview with the defendant, as evidenced by the following entries in his notes: (1) "Patents—None"; and (2) "[Product Technologies] has 2 trademarks: SmartCity granted 1996, 1997; Watch thing Bill Mangino 1994 . . . ."

Finally, I note that the defendant, and presumably Pia, reasonably could have concluded that the software did not have substantial value in April, 1998, even though Product Technologies had expended more than $1 million in development costs. At the hearing on the plaintiff's motion to open, the defendant testified that:

---

[10] The majority states: "The dissent suggests that because Pia was an expert in valuing businesses, he should have either independently assessed the worth of the intellectual property asset or asked more questions concerning its worth." Footnote 12 of the majority opinion. The majority then notes that my purported view is inconsistent with *Billington* v. *Billington*, supra, 220 Conn. 222, in which we abandoned the due diligence requirement. Either the majority misunderstands my argument or it is overreaching. I merely assert that Pia's appraisal provides a reliable benchmark precisely because he *likely was diligent* in including the worth of the software. In other words, because Pia is an experienced appraiser, he likely considered the worth of the software when he performed his appraisal and arrived at a value that was comparable to the defendant's estimate.

The majority also states that "Pia's valuation necessarily was limited by the information disclosed by the defendant." Footnote 12 of the majority opinion; see also footnote 14 of the majority opinion. Once again, the majority's assertion is unsupported by the record. At the hearing on the motion to open, Pia did not testify that he was denied any information concerning the intellectual property rights. Indeed, the only document that Pia thought he should have received but did not was the private placement memorandum. It is noteworthy that Pia did not testify, and was not asked, whether his valuation would have differed if he had been given the placement memorandum. Despite this fact, the majority posits that the placement memorandum was "the only document that evidenced the . . . potential" marketability of the source codes from the SmartCity software. Footnote 13 of the majority opinion. The majority's assertion is incorrect. One need only look to the exhibits in this case to find a comprehensive sales brochure that describes the asset's potential. It is called, "SmartCity *fashioning the industry* . . . ." (Emphasis in original.)

(1) Product Technologies and ICL were posturing for litigation over the rights to SmartCity software in the spring of 1998; (2) the software was the "lifeblood" of Product Technologies; (3) ICL's pending claim to the software imperiled its worth; (4) no investors would be interested in Product Technologies until that claim was resolved; and (5) Product Technologies did not have the resources to engage in protracted litigation. Although the defendant did not state his belief that the software would be worthless once ICL asserted a legal claim, he did state, "we were between a rock and a very big hard place." The majority, however, does not credit this testimony. Instead, it considers only the defendant's statement that his estimate was based on the "book value" of Product Technologies and draws inferences from that testimony in a way that undermines, rather than supports, the trial court's findings.

When the evidence is viewed as a whole, it is clear that the plaintiff has not proved by clear and convincing evidence that the defendant did not include the worth of the software in his affidavit. Moreover, the plaintiff's claim should be rejected for another reason, namely, because the plaintiff offered no evidence that the purported omission was made with the intent to deceive. The majority nevertheless seems to believe that the plaintiff does not need to do so. Implicit in the majority's analysis is the notion that *Billington* allows us to infer fraud automatically whenever a party to a dissolution proceeding makes a misrepresentation or omission. Because that assumption pervades the majority opinion, I pause for a moment to discuss *Billington*.

The primary issue in *Billington* was "whether a party to a marital dissolution judgment must establish, in order subsequently to open the judgment based upon a claim of fraud, that she was diligent during the original action in attempting to discover this fraud." *Billington* v. *Billington*, supra, 220 Conn. 214. In answering that

question in the negative, we concluded that the diligence prerequisite is inconsistent with the requirement of full and frank disclosure in marital actions; id., 220–21; and "our strong policy that the private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine." (Internal quotation marks omitted.) Id., 221. In so concluding, "we recognize[d] the need for finality of litigation and stability of judgments"; id., 222; but determined that the aforementioned policy goals "sufficiently outweigh[ed] those interests of finality and stability in the marital litigation context so as to require the abandonment of the diligence requirement." Id. We further stated, however, that "the need for finality and stability is adequately protected by the remaining limitations upon the granting of relief from fraud." Id.

As *Billington* makes clear, one of these remaining limitations is that "[t]here must be *clear proof of the perjury or fraud.*" (Emphasis added; internal quotation marks omitted.) Id., 218. Thus, unlike the majority, I do not read *Billington* to stand for the proposition that fraud should be inferred automatically, thereby relieving a plaintiff of his or her burden of proof, whenever a party makes a misrepresentation or omission concerning financial assets.

B

Assessment of $2.5 Million Offer
as "Too Low"

I now consider the majority's second ground on which it concludes that the defendant committed fraud in his affidavit, namely, that, even if the defendant did include the value of the software in his $40,000 estimate, his assessment of ICL's $2.5 million offer as too low also constitutes clear and convincing proof of fraud. The majority posits that, "[i]f the defendant's valuation

of $200,000[11] for the company had been an accurate assessment that included the worth of the intellectual property asset, then he could not have believed that ICL's $2.5 million valuation of the company was too low because it excluded the value of that asset." In light of this evidence, the majority concludes that "the trial court *reasonably* could not have found a lack of correlation between the defendant's assessment of the $2.5 million offer as too low and his valuation of Product Technologies during the dissolution trial . . . ." (Emphasis in original.)

The defendant's so-called assessment of the $2.5 million offer traces its origin to his June 17, 1998 letter to Wain. As I noted previously, the defendant wrote that letter on behalf of Product Technologies in response to Wain's threat of litigation on the previous day. In that letter, the defendant asserted that ICL did not possess equal ownership of the software rights, as Wain contended, because Product Technologies had made many enhancements to the software that fell outside of the purview of the parties' agreement. He also asserted that Product Technologies would vigorously protect its rights under the agreement and would seek to recover damages if ICL asserted a legal claim. Finally, the defendant wrote: "[Product Technologies] Management clearly understood at the meetings on [June 15, 1998] that your position on [intellectual property rights] is a major factor in the low valuation of [Product Technologies]. If this position is seriously flawed, then so is the valuation." It is this latter passage that forms the basis of the majority's determination that the defendant committed fraud.

At the hearing on the motion to open, the defendant explained what he meant by his final statements to Wain. He testified that ICL was willing to pay $2.5 mil-

---

[11] See footnote 7 of this opinion.

lion for Product Technologies under the assumption that ICL owned all of the intellectual property rights to the SmartCity software; in the defendant's view, however, that offer was too low because Product Technologies owned some of those intellectual property rights exclusively. The defendant also testified that he and Mangino believed that ICL's offer was an insincere gesture designed to pilfer the software codes. The majority fails to consider the defendant's entire testimony concerning his statements to Wain and disregards the context in which they were made. The majority selectively relies on only the defendant's testimony that he had told ICL that its offer was too low.

When I view the defendant's letter to Wain in conjunction with his testimony, I do not believe that it provides any insight into the defendant's state of mind during the dissolution proceedings. Indeed, I read the final passage in that letter simply to be an aggressive negotiating tactic that was made in the heat of a contentious dispute with ICL. I also find the defendant's letter, when read in conjunction with Wain's letter, to be highly probative of the defendant's representation that he and Mangino believed that ICL was intent on gaining access to the software codes so that ICL could emerge as a competitor. I certainly would not consider it to be a thoughtful and deliberative "assessment" of the worth of Product Technologies in light of the context in which it was made. Thus, I would afford a presumption in favor of the trial court's finding and hold that the trial court correctly found no correlation between the defendant's assessment of the $2.5 million offer on June 17, 1998, and his knowledge of the company's value during the dissolution proceedings.

I note, moreover, that the majority fails to consider other evidence in the record that undermines its conclusion and supports the trial court's overall finding that the plaintiff has not proved by clear and convincing

evidence that the defendant knew his interest in Product Technologies was worth more than $40,000. First, it is clear from the defendant's testimony at the hearing on the plaintiff's motion to open that he believed that Product Technologies' future looked rather bleak in April, 1998. He testified that the company's financial resources were limited, and its efforts to raise capital from investors had proven to be unsuccessful. He explained that Product Technologies' future was rendered even more uncertain by ICL's claim to the intellectual property rights. Indeed, the defendant stated that he thought no company would be interested in investing in Product Technologies until that claim was resolved, and he believed that the company did not have the resources to defend against that claim. This testimony supports the trial court's finding that the defendant reasonably could have believed that his interest in Product Technologies did not have significant worth during the dissolution proceedings.

Second, the defendant told Pia, during their interview, that he would be willing to agree to a "tail," meaning that the plaintiff could retain an ownership interest in a certain percentage of the defendant's shares of Product Technologies for up to two years. Although the "tail" would have allowed the plaintiff to share in any gain that the company might have realized if it prospered or was acquired by another company, it also would have required her to assume the risk that she would receive nothing from this asset if Product Technologies was unsuccessful. Pia explained that he did not consider the "tail" option to be particularly attractive at that time. Although the majority acknowledges, in part III of its opinion, that the defendant agreed to offer the plaintiff a "tail," it focuses on the grounds on which she supposedly declined that offer, which, in my view, simply do not matter. What does matter is the fact that the defendant actually agreed to make the

offer because it negates the inference that he knowingly misrepresented the value of his interest in Product Technologies in his affidavit. In other words, if the defendant knew that his interest in Product Technologies was worth substantially more than $40,000, and was trying to hide that fact from the plaintiff, why would he agree to offer her a 20 or 30 percent interest in his shares, presumably for a nominal amount?[12] The majority does not consider the defendant's "tail" offer from that perspective, presumably because it would defeat proof of the scienter element that is essential to a finding of fraud. Again, the majority views the evidence in a light that undermines, rather than supports, the trial court's finding.[13]

Third, in January, 1997, the defendant sold slightly less than one half of his shares to Mangino in exchange for a reduced work schedule so that he could spend more time with his daughter. The price was $5000, plus a $1000 increase in his monthly salary.[14] From the time

[12] Since the defendant valued his shares in the company at $40,000, the plaintiff presumably could have obtained a 20 to 30 percent interest for $8000 to $12,000.

[13] This observation prompted the majority to write: "The obvious answer to the dissent's query of why the defendant would consider offering the plaintiff a 'tail' . . . is that he clearly colored that offer by representing to the plaintiff that Product Technologies had virtually no future and no sale or investment prospects." Footnote 27 of the majority opinion. There is absolutely no evidence in the record that the defendant misrepresented Product Technologies' uncertain future to either the plaintiff or Pia. Moreover, the trial court specifically found that there were no sales negotiations underway during the dissolution proceedings, and, therefore, the defendant did not know that an offer would be made two months later. Even the plaintiff does not challenge that finding on appeal. Thus, the majority's reasons for failing to consider the defendant's willingness to offer a "tail" as evidence tending to disprove scienter are unfounded.

[14] The majority essentially writes that this stock sale is not credible evidence of the defendant's knowledge of the worth of the company at the close of the dissolution proceedings because the defendant's strategy for developing the asset's potential may not have existed when the sale occurred in January, 1997. See footnote 13 of the majority opinion. First, there is no evidence in the record to support the majority's assertion. Second, the majority fails to realize that the significance of the stock sale lies in the

of that stock sale to the date of dissolution, the financial condition of the company only grew more precarious, as demonstrated by a comparison of the initial and revised private placement memoranda that Product Technologies issued in May, 1997, and March, 1998, respectively. In light of the foregoing evidence, I conclude that the trial court reasonably determined that the plaintiff had failed to prove by clear and convincing evidence that the defendant had misrepresented the value of his interest. In my view, the trial court's conclusion is far more reasonable than the one drawn by the majority, which is premised almost exclusively on the defendant's cryptic passage in his letter responding to ICL's threat of litigation.

The majority also contends that "the huge disparity between the value that the defendant placed on Product Technologies in April, 1998, and the value that ICL placed on the company just two months later *compels* the conclusion [that] the defendant knew the company and his interest therein were worth more during the dissolution trial." (Emphasis in original.) I disagree. Even if ICL initially valued Product Technologies at $2.5 million on June 15, 1998, and subsequently raised its price to $6 million, that does not compel the conclusion that the company was worth that much during the dissolution proceedings. More importantly, however, even if I assumed that the company was worth millions of dollars during the dissolution proceedings, the plaintiff has not offered any credible evidence that the defendant had any reason to know it, nor does the majority cite any in its opinion. Rather, the majority simply imputes ICL's perceived worth of Product Technologies

undisputed fact that the company's finances worsened substantially between the date of the stock sale and the date of dissolution. Third, Pia, who is an experienced business appraiser, thought it was significant to his valuation. In fact, Pia testified that one of his valuation techniques involved the extrapolation of information from that stock sale to determine the value of the defendant's interest in Product Technologies.

to the defendant and, in doing so, adopts the plaintiff's speculative inference and substitutes it for the contrary and well supported finding of the trial court.

If I were to rely on a third party's appraisal to ascertain whether the defendant could reasonably have thought his interest in Product Technologies was worth only $40,000 during the dissolution proceedings, I would look to Pia's valuation, which the majority completely ignores.[15] In my view, Pia's appraisal is particularly insightful because: (1) it was prepared in the spring of 1998 on the basis of the company's outlook at the time and without the benefit of hindsight; (2) it was made when there was no interest by anyone, including ICL, in purchasing Product Technologies;[16] and (3) it was based on essentially the same information that the defendant had available to him. Furthermore, neither party disputed Pia's qualifications or the comprehensiveness of his work. At the hearing on the plaintiff's motion to open, Pia described his valuation approach. First, he interviewed the defendant and asked him a number of questions about Product Technologies, including: (1) "[who] its competitors were"; (2) "what its long-term prospects were"; (3) "[what] its outlook [was] as of [the] date that [he was] looking to value the company"; and (4) "what was happening in the current fiscal year." Pia further testified that the defendant had told him that if the company "continued on the same pattern as it was at that point in time, it would have died a slow [death], so either [it was] going to grow quickly and die a quick death or be successful." Pia's notes contain additional details concerning the informa-

[15] The majority concludes that Pia's appraisal is not reliable because he did not have accurate information on which to base his estimate of the worth of the intellectual property asset. See footnote 14 of the majority opinion. As I explained in footnote 10 of this opinion, the majority's conclusion contradicts the record.

[16] As I previously noted, ICL was threatening to pursue legal action against and compete with Product Technologies in the United States at this time.

tion that he gleaned during his interview with the defendant. With respect to the company's market position and financial status, Pia made notations that are consistent with the information contained in the private placement memoranda. Specifically, he wrote, "Intense competition," "Visa, MC, MCI," and "Under capitalized . . . ." He also wrote, "3 largest customers all have ceased buying from [Product Technologies] . . . ." Finally, he noted the defendant's stock sale to Mangino.

Pia also collected documents from the defendant and others that substantially filled a trunk and nine notebook binders. He relied on these data along with information that he had obtained from his interview with the defendant in utilizing three different valuation methods. Pia's analysis revealed that the defendant's shares in Product Technologies were worth between $35,000 and $68,000 at the time of the dissolution proceedings, and he fixed his appraisal at $40,000. In my view, if Pia believed that the company was worth only $40,000 in April, 1998, then so, too, could the defendant. I also find it significant that Pia did not testify at the hearing on the motion to open whether, in retrospect, he would have performed his appraisal differently in light of his newfound knowledge of the $2.5 million offer and the subsequent $6 million sale. Nor did the plaintiff's counsel ask him that question. That omission is telling in its own right.

In sum, the plaintiff's claim, as well as the majority's analysis of it, is based entirely on hindsight and gross speculation. The plaintiff has not offered any credible evidence, much less clear and convincing evidence, that the defendant *knew* or even *should have known* that his interest in Product Technologies was worth more than $40,000 in April, 1998. I therefore would sustain the trial court's conclusion that the plaintiff had not met her burden of proving that the defendant had fraud-

ulently misrepresented the value of his interest in Product Technologies in his financial affidavit.

## III

### Nondisclosure of the $2.5 Million Offer as Fraud

I now turn to the majority's second ground for reversal, namely, that the defendant's failure to disclose the $2.5 million offer constituted fraud in its own right. In reaching that conclusion, the majority reasons that: (1) the defendant's duty to disclose information affecting his finances continued until June 16, 1998, the date on which the dissolution court denied his motion for reconsideration; (2) the defendant therefore should have disclosed the $2.5 million offer that Product Technologies had received from ICL on June 15, 1998; and (3) his failure to make that disclosure automatically constituted fraud.

### A

### Duty to Disclose

I first consider the majority's new continuing disclosure rule, which rests on three interrelated propositions. First, the duty to disclose necessarily must continue until the date of dissolution because, in *Sunbury* v. *Sunbury*, 216 Conn. 673, 676, 583 A.2d 636 (1990), we held that the date of dissolution is the proper time to value the marital assets. Second, our decision in *Billington* essentially mandates that we further extend the duty to disclose until the judgment is final. See *Billington* v. *Billington*, supra, 220 Conn. 217–18, 222. Third, the rule of *Killingly* v. *Connecticut Siting Council*, 220 Conn. 516, 526, 600 A.2d 752 (1991), extends that duty even further because, in *Killingly*, we determined that a motion for reconsideration suspends the finality of a judgment until the court acts on that motion. The majority applies these three principles to the facts of the present case and holds that the

defendant was obligated to disclose ICL's $2.5 million offer on June 15, 1998, more than one month after the dissolution of marriage was final. I disagree.

First, *Sunbury* had absolutely nothing to do with a party's duty to disclose changes to his or her financial status during a marital dissolution proceeding. Rather, the issue in *Sunbury* was whether the marital estate should be valued as of the date of dissolution or the date of the subsequent hearing that was conducted following our remand of the case to the trial court. See *Sunbury* v. *Sunbury*, supra, 216 Conn. 674–75. In concluding that it was the date of dissolution, we relied on General Statutes § 46b-81 (a)[17] and on "well recognized principles regarding the finality of actions." Id., 677. We did not, however, discuss the parties' duty to disclose because it was not at issue in *Sunbury*.

Nor did we address in *Billington* the date on which a party's duty to disclose terminates. As I explained previously, we considered whether a party in a marital dissolution action must prove that he or she was diligent in uncovering the other party's fraud during the dissolution proceedings "in order subsequently to open the judgment based upon a claim of fraud . . . ." *Billington* v. *Billington*, supra, 220 Conn. 214. In answering that question in the negative, we recognized the need for full and frank disclosure in marital actions; id., 219–22; but did not state that the duty to disclose continued until the judgment was final. I note, however, that, even if *Billington* could be read to stand for that proposition, the judgment in this case was final on May 12, 1998, the date on which the court entered the divorce decree and issued its financial orders. At that point, there is no question that the parties' marriage was dis-

---

[17] General Statutes § 46b-81 (a) provides in relevant part: "*At the time of entering a decree annulling or dissolving a marriage* . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . ." (Emphasis added.)

solved and the defendant's obligation to make the court-ordered payments came into force.

The defendant's filing of a motion for reconsideration did not affect the finality of the dissolution judgment, and, contrary to the majority's assertion, *Killingly* v. *Connecticut Siting Council*, supra, 220 Conn. 516, does not alter that conclusion. In *Killingly*, we explained that the filing of a motion for a rehearing before an administrative agency may preclude a party from appealing that decision to the Superior Court while the motion for a rehearing is pending. Id., 523–24, 526. Even if I were to assume that the defendant's filing of a motion for reconsideration in this case also delayed his ability to file an appeal, I nonetheless would conclude that such a delay has no bearing on the issue in this case.

It is important to remember that this case involves the valuation of a marital asset, specifically, the defendant's 19.4 percent interest in Product Technologies. In *Sunbury*, we made it clear that marital assets should be valued as of the dissolution date. *Sunbury* v. *Sunbury*, supra, 216 Conn. 676. Integral to the *Sunbury* rule is the notion that the valuation will take into account events that bear on the value of assets up until the dissolution date but will exclude those that occur thereafter. See id. In other words, because *Sunbury* fixes the valuation date of marital property as the date of dissolution, events that occur thereafter are irrelevant with respect to a motion for reconsideration. Indeed, if the rule were otherwise, there never would be an end to litigation between estranged marital partners. I note, furthermore, that a motion for reconsideration does not present a dissatisfied litigant with the opportunity to try to force a revaluation and reallocation of the marital assets simply because subsequent events reveal that an asset has a higher value than that which it was assigned on the dissolution date. Rather, a motion for reconsideration is merely a request that the court reconsider its

original decision on the basis of the facts that were known on the date of judgment. See, e.g., *Opoku* v. *Grant*, 63 Conn. App. 686, 692–93, 778 A.2d 981 (2001). It does not change the valuation date, and that is true regardless of whether the motion delays the parties' ability to file an appeal. In the present case, Product Technologies received the $2.5 million offer more than one month after the valuation of the parties' assets was fixed on May 12, 1998, the date of the dissolution judgment. In light of that fact, I do not understand how the majority can conclude that the defendant had a duty to disclose that offer because such a disclosure would have served no useful purpose.

I also note that the majority's new continuing disclosure rule violates Practice Book § 13-15, which provides in relevant part: "If, subsequent to compliance with any request or order for discovery and *prior to or during trial,* a party discovers additional or new material or information previously requested and ordered subject to discovery or inspection or discovers that the prior compliance was totally or partially incorrect or, though correct when made, is no longer true and the circumstances are such that a failure to amend the compliance is in substance a knowing concealment, that party shall promptly notify the other party, or the other party's attorney, and file and serve . . . a supplemental or corrected compliance." (Emphasis added.) Thus, under the express provisions of Practice Book § 13-15, a party's continuing duty to disclose information that affects the financial information reported in his or her affidavit terminates at the conclusion of the trial. I assume, without deciding, that the term "trial" could be construed to extend to the date on which the court renders its judgment, which, in the present case, was May 12, 1998. Such a reading would be compatible with *Sunbury* because the parties' duty to disclose would terminate on the same date that the assets are valued.

In holding that the duty to disclose continues after trial and extends until the court acts on a motion for reconsideration, the majority essentially amends Practice Book § 13-15. The majority, however, does not have the authority to make such an amendment because that authority is vested in the judges of the Superior Court. See General Statutes § 51-14 (a); cf. *Kupstis* v. *Michaud*, 215 Conn. 435, 437, 576 A.2d 152 (1990) (observing that "[t]he problem illuminated by [the] litigation [in that case] call[ed] for a change in the rules of practice that this court [could not] enact"). I therefore dispute the validity of the majority's new rule.

Unlike the majority, I would reject the new continuing disclosure rule advocated by the plaintiff because it violates our precedent and the rules of practice. I simply would hold that Practice Book § 13-15 governs the defendant's duty to disclose in this case. Because that provision makes clear that such a duty terminates at the conclusion of the dissolution trial, and because Product Technologies received ICL's $2.5 million offer after the trial had concluded, the defendant had no duty to disclose it.

B

The Majority's Finding of Fraud

Even if the majority's new continuing disclosure rule can somehow be deemed valid, the defendant's failure to conform to it cannot possibly support a finding of fraud. In order for the defendant to have committed fraud by virtue of his failure to disclose the $2.5 million offer, he must have *known* that he had a duty to disclose it. I certainly did not know before today that the defendant had such a duty and, therefore, I cannot imagine how the defendant, a nonlawyer, possibly could have possessed that knowledge. Even if the defendant was clairvoyant, that does not relieve the plaintiff of her burden of proving that his failure to disclose ICL's offer

on June 15, 1998, was calculated to deceive. The plaintiff offered absolutely no evidence to support such a finding. Indeed, we do not even know if the defendant was aware that his attorney was appearing in court on June 15, 1998, to argue his motion for reconsideration, nor do we know whether the defendant's meeting with ICL ended before the close of court on June 15, 1998. This lack of evidence is the direct result of the plaintiff's failure to raise this fraud claim at the hearing on her motion to open. See part III C of this opinion.

The majority nonetheless ignores this evidentiary void and determines that the defendant committed fraud because he "must have *known* that he bore a duty to disclose this information because such a duty is *inherent* in the nature of the request [that] he made before the court in his motion for reconsideration." (Emphasis in original.) That is so, the majority informs us, because the defendant's situation "is akin to the defendant going before the court and asking it to reduce his child support obligations because he was unemployed and could barely support himself, while concealing the fact that he had a lucrative job offer . . . ." This argument misses the mark because the majority fails to recognize that there is a fundamental distinction between a motion for modification of child support or alimony and a motion for reconsideration, namely, that a party's changed financial circumstances are relevant to the former but not the latter. That is because a motion for reconsideration is merely a request that the court reconsider its original ruling on the basis of the evidence that was before it when that ruling was made. See *Opoku* v. *Grant*, supra, 63 Conn. App. 692–93. It does not involve the presentation of new evidence. See id. Thus, contrary to the majority's assertion, Product Technologies' receipt and rejection of the $2.5 million offer on June 15, 1998, was not "directly pertinent and material" to the defendant's motion for reconsideration as it per-

tained to the court-ordered alimony and child support payments. All of this is irrelevant, however, because this case is not about alimony or child support and, therefore, the majority's analogy is nothing more than a red herring. This case involves the valuation of a marital asset. Because the party's assets were valued on May 12, 1998, the $2.5 million offer would not have been relevant to the defendant's motion for reconsideration of the court-ordered property division. Thus, the court's decision to grant or to deny that motion would not have been influenced by Product Technologies' receipt and rejection of the $2.5 million offer. Consequently, even if the defendant had disclosed that offer to the court, it would not have changed the outcome in this case. The plaintiff therefore was not harmed by the defendant's failure to disclose the offer.

The majority nevertheless asserts that the plaintiff indeed was harmed because, if the defendant had "timely disclosed the $2.5 million offer . . . the plaintiff would have been well within the four month period during which the plaintiff would have been permitted to file a motion to open the judgment, subject only to review as to whether the court acted unreasonably or in clear abuse of its discretion." In other words, the plaintiff would not have been "saddled" with proving fraud. In response to that argument, I note the following. First, the majority assumes that the plaintiff's motion to open would have been granted automatically if it had been filed within the four month window. I disagree with that assumption. A motion to open, like a motion for reconsideration, is not an opportunity for a dissatisfied litigant to get a second bite at the apple by seeking a revaluation and reallocation of the assets due to postdissolution events. Because the $2.5 million offer was a postdissolution event, I believe that the plaintiff would have needed to prove that the defendant intentionally had misrepresented the value of his interest in Product

Technologies *as of the dissolution date* in order to prevail on her motion to open. That takes us right back to where we started, that is, with the plaintiff's first claim of fraud that stems from the defendant's misrepresentation in his affidavit. Thus, the only thing that the majority has accomplished in its convoluted and circular reasoning is to confuse the law governing the valuation of marital assets and the duty to disclose. Second, in light of the majority's holding, I believe that it is likely that we will see far more dissatisfied marital litigants filing motions for reconsideration because it will impose on the opposing party a continuing duty to disclose any changes to that party's assets while the motion is pending. In my view, that will undermine the need for "finality of litigation and stability of judgments . . . ." *Billington* v. *Billington*, 220 Conn. 222. Third, the majority's new continuing disclosure rule will be confusing to litigants, attorneys and the lower courts because its contours are completely undefined. For example, the majority does not indicate whether a party now must report normal appreciation in the value of real estate and other assets while a motion for reconsideration is pending. Nor does it enlighten us as to whether a party who owns publicly traded stocks now must disclose increases and decreases in the value thereof.

## C

### Defendant's Alternative Grounds for Affirmance

Finally, I note that the defendant urges us to affirm the judgment of the Appellate Court on two alternative grounds, namely, that the plaintiff failed: (1) to preserve her claim pertaining to the defendant's continuing duty to disclose the $2.5 million offer; and (2) to raise that claim in her motion to open. The majority rejects both grounds, concluding that they lack merit. I disagree and, therefore, briefly discuss them because, in my

view, they illustrate the unfairness that inures to the detriment of the defendant, the trial court and the Appellate Court by virtue of the majority's decision to allow the plaintiff to advance her continuing duty to disclose claim on appeal.

In the plaintiff's motion to open, she essentially claimed that the defendant knew that the $40,000 value reported in his affidavit was false because Product Technologies and ICL were engaged in sales negotiations or discussions *during the dissolution proceedings* and he failed to disclose that information to the plaintiff, thereby inducing her to rely on the value that he had reported in his affidavit.[18] Indeed, the plaintiff conceded that this was her claim at the hearing on the motion to open when the court posed the following question to her attorney: "[I]n order for you to prevail . . . don't you have to . . . show that the seeds, at least the seeds of this acquisition, were planted and well watered before the trial [which concluded on April 17, 1998]?" The plaintiff's counsel responded: "Yes, Your Honor. I do need to show that."

The plaintiff focused principally on the actual sale of Product Technologies as evidence of fraud at the hearing on her motion to open. The plaintiff's counsel also elicited testimony from the defendant concerning

[18] The gravamen of the plaintiff's fraud claim appears in the following paragraphs in her motion to open: "5. At the time of trial, [the] defendant submitted a financial affidavit, placing a value on his interest in [Product Technologies at $40,000]. . . .

"7. Based on [the] defendant's representations, the parties agreed on a value of [$40,000] as the defendant's interest in his business. . . .

"9. Several months after the trial, and after the decision, [the] defendant's business was sold for [$6 million]. . . .

"11. In spite of diligent efforts on the part of the plaintiff to discover the true value of the defendant's interest in his business, *the defendant did not disclose to the plaintiff that any negotiations or discussions regarding [the] sale of [Product Technologies] were transpiring during the pendency of the divorce, and so the defendant misrepresented the value of his business.*" (Emphasis added.)

the reasons why Product Technologies rejected ICL's $2.5 million offer and why the defendant characterized that offer as too low. She did not, however, elicit testimony from the defendant or any other witnesses that would establish a record on which a court could decide her continuing duty to disclose claim.

During closing argument at the hearing on the motion to open, the court asked the plaintiff's counsel whether she thought that the defendant's duty to disclose extended beyond the conclusion of the evidentiary portion of the dissolution trial on April 17, 1998. She responded that, in her view, the defendant's duty to disclose extended to June 16, 1998, the date on which the court denied the defendant's motion for reconsideration. During closing argument, counsel for the defendant briefly commented that she was unaware of any legal authority that would support the assertion of the plaintiff's counsel that the defendant's duty to disclose extended beyond April 17, 1998.

The trial court denied the plaintiff's motion to open and issued a thirty-nine page decision in support of its findings and conclusions. The court found that, "as of the time of [the dissolution] trial, April 16 and 17, 1998, there was no sale pending, no offer to purchase had been made, and . . . no negotiations or discussions regarding [the] sale of the business had taken place." The plaintiff therefore could not prevail on her fraud claim asserted in her motion to open. The court also found that Product Technologies' rejection of the $2.5 million offer as too low did not support an inference that the defendant knew that the company was worth that amount or more during the dissolution proceedings. The court did not address the belated assertion of the plaintiff's counsel that the defendant's duty to disclose extended beyond the conclusion of the dissolution trial.

The plaintiff thereafter filed a motion for reconsideration of the denial of her motion to open. In that motion, the plaintiff distinctly claimed, for the first time, that the defendant's duty to disclose information affecting the value of his assets extended to June 16, 1998, and, therefore, that he should have reported the $2.5 million offer that ICL had made to purchase Product Technologies on June 15, 1998. The court rejected that claim, however, because it contradicted the plaintiff's counsel's earlier representation that the allegations contained in the motion to open required the plaintiff to prove that the sales negotiations had commenced well before the conclusion of the dissolution proceedings on April 17, 1998. The court therefore ruled that the plaintiff's claim was "beyond the scope of her pleading." The court further observed that there was no legal support for the proposition that the defendant's duty to disclose extended beyond the close of the dissolution trial.

The plaintiff appealed from the trial court's denial of her motion to open to the Appellate Court, which affirmed the trial court's ruling in all respects. *Weinstein* v. *Weinstein*, 79 Conn. App. 638, 649, 830 A.2d 1134 (2003). Like the trial court, the Appellate Court did not consider the plaintiff's continuing duty to disclose the claim even though the plaintiff fully briefed it on appeal to the Appellate Court. When the plaintiff asserted that claim on appeal to this court, the defendant responded with two alternative grounds for affirmance. First he argued that the plaintiff did not preserve that claim at trial. Second, he argued that the plaintiff's counsel conceded that she did not plead it. Although I believe that both alternative grounds have merit, I focus my attention on the first ground advanced by the defendant.

"We have stated repeatedly that we ordinarily will not review an issue that has not been properly raised

before the trial court. See, e.g., *Santopietro* v. *New Haven,* 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court not required to consider any claim that was not properly preserved in the trial court); *Yale University* v. *Blumenthal,* 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (court declined to consider issues briefed on appeal but not raised at trial) . . . ." (Citations omitted; internal quotation marks omitted.) *Gordon* v. *Tobias,* 262 Conn. 844, 846 n.1, 817 A.2d 683 (2003). That well settled rule is rooted in Practice Book § 5-2, which provides in relevant part: "Any party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief . . . or state the question distinctly to the judicial authority on the record *before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. . . ."* (Emphasis added.)

In the present case, the plaintiff did not brief her claim to the trial court. Although she alleged that the defendant rejected the $2.5 million offer as too low, she did not present any legal argument in support of her claim that the defendant had a continuing duty to disclose that offer. Nor did she distinctly raise that claim at any time during the proceedings on the motion to open. Rather, as I noted previously, she merely alluded to that claim during closing argument, in response to questions by the court. It is clear that this brief reference by the plaintiff's counsel to the claim that the plaintiff now seeks to advance on appeal does not satisfy the requirement that a claim be distinctly raised at trial before closing argument. Practice Book § 5-2; see *Swerdloff* v. *AEG Design/Build, Inc.,* 209 Conn. 185, 188, 550 A.2d 306 (1988) ("a claim 'briefly suggested' is not 'distinctly raised' "). Indeed, the fact that the trial court did not address this claim in its

memorandum of decision bolsters my conclusion that the plaintiff did not distinctly raise it at the hearing on the motion to open. So, too, does the fact that there is virtually no evidence in the record to support it. If this claim had been distinctly raised, I submit that one or both of the parties would have elicited testimony that would have proved or disproved, inter alia, whether the defendant knew he had a continuing duty to disclose, whether he knew that his attorney was appearing in court on June 15, 1998, the day on which arguments were held for the defendant's motion for reconsideration of the financial orders, and what time of day the meeting with ICL occurred. I note, moreover, that the plaintiff's belated attempt to raise this new claim in her motion for reconsideration does not rectify her failure to raise it at the hearing on the motion to open because it is well established that "[a] motion to reargue . . . is not to be used as an opportunity to have a second bite of the apple . . . ." *Opoku* v. *Grant*, supra, 63 Conn. App. 692–93. In my view, it is grossly unfair to the defendant for the majority to decide this claim on appeal because he could not foresee it and, therefore, was denied the opportunity to present evidence in defense of it.

The majority disagrees and contends that the defendant was not "ambushed" by the plaintiff's continuing duty to disclose claim because counsel for the defendant "defended against that claim in his closing argument, raising the same arguments against it that [the defendant] raises in his brief to this court." Footnote 9 of the majority opinion. That is wrong for two reasons. First, the plaintiff's counsel's brief reference to this claim in her closing argument followed the evidentiary portion of the trial. The defendant therefore did not have an opportunity to present factual evidence in defense of that claim because he had no notice of it. Second, the majority's assertion cannot be squared with

the record. The following excerpts from the transcript, which reflect the entirety of the defendant's counsel's closing remarks pertaining to the continuing duty to disclose claim, demonstrate that the defendant's counsel was confused by the plaintiff's belated claim. Specifically, the defendant's counsel stated: "Your Honor, just to clarify, we discussed the date of the trial versus the date of the judgment. I don't believe there's any case on point which stretches anything to the date of the judgment. However, I don't think it's—that's terribly much at issue because there's—there was no activity that was dealt with between those times. But as far as the motion for reconsideration, since that was denied, I believe that strongly pushes that date back." In other words, counsel for the defendant claimed that the principal issue was whether the duty to disclose ended as of the close of the evidentiary portion of the trial or as of the date of the dissolution judgment. With respect to the motion for reconsideration, I interpret the defendant's counsel's remarks to mean that she believed that the dissolution court's denial of that motion reaffirmed that the judgment was final on May 12, 1998. She did not even broach the linchpin of the plaintiff's claim, namely, that the filing of a motion for reconsideration continues the duty to disclose while the motion is pending.[19] Thus, contrary to the majority's assertion, counsel

[19] In support of its conclusion that the plaintiff raised this claim at trial, the majority cites another part of the defendant's counsel's closing argument in which she stated that the defendant would not have filed a motion for reconsideration if he "had thought ICL was going to come along and offer him a lot of money or any money . . . . And the fact that that motion was denied again strongly pushes that the date that we need to look at back to the time of trial . . . ." (Internal quotation marks omitted.) Footnote 9 of the majority opinion. The majority, however, fails to refer to the next sentence of the defendant's counsel's argument, as it appears in the transcript. Specifically, she states: "So they—in order to prevail, they need to clearly show that, before April, they had an offer." This sentence makes clear that the closing remarks cited by the majority do not pertain to the plaintiff's continuing duty to disclose claim. Instead, they were made in defense of the claim that the plaintiff actually pleaded in her motion to open, namely, that the defendant knew that sales negotiations were underway during the dissolu-

for the defendant did not have an opportunity to raise the same arguments at trial that the defendant now makes on appeal. In light of the foregoing, it is clear that the majority's decision to review the plaintiff's claim is grossly unfair to the defendant. It also is unfair to the trial court and the Appellate Court, both of which, appropriately, declined to review this claim.

Finally, I find the majority opinion to be confusing because of the absence of any direction to the trial court on remand. The majority rejects the trial court and Appellate Court decisions on separate grounds, each of which appears to establish a different date for valuing the marital assets. The first ground is that the defendant committed fraud in his affidavit. Presumably, the date of revaluation on remand under this theory is May 12, 1998, the date of dissolution. The second ground of fraud, however, is predicated on the defendant's failure to disclose the $2.5 million offer pursuant to the majority's new continuing disclosure rule. Under this theory, the assets must be revalued as of June 16, 1998, the date on which the dissolution court denied the defendant's motion for reconsideration and on which the defendant's duty to disclose finally terminated. Otherwise, there would be no purpose for the majority's new rule. The question then becomes: What is the trial court to do?

That inquiry is not insignificant because the trial court's choice of a valuation date could vary the disposition of this case greatly. That is so because the value of a business at any point in time depends on then-existing market conditions. On May 12, 1998, there was only one possible buyer for Product Technologies,

---

tion proceedings and failed to disclose that information to the plaintiff in order to induce her into relying on the $40,000 estimate that the defendant had reported in his affidavit.

which was ICL. At that time, however, ICL was not interested in acquiring the company but, rather, was planning to litigate and to compete. The market conditions changed in a pronounced fashion in June, 1998, when ICL decided to acquire Product Technologies and placed an offer on the table. Thus, as a factual matter, the value of the defendant's interest in Product Technologies on May 12, 1998, differed markedly from its value on June 16, 1998.[20] The choice of a valuation date, therefore, will be critical.

Despite that fact, the majority does not even acknowledge that the two theories underlying its opinion give rise to different valuation dates. Rather, the majority simply offers us two insights. First, it states that "[t]he trend [in valuing marital assets] appears to be moving away from mandating a specific date for valuation and toward a flexible approach [under which] the court has discretion to assign the date of valuation . . . ." (Internal quotation marks omitted.) Footnote 26 of the majority opinion, quoting 2 A. Rutkin, Family Law and Practice (2005) § 13.04 [1], p. 13-67. I refer the majority to General Statutes § 46b-81 (a); see footnote 17 of this opinion; and our interpretation of that statute in *Sunbury* v. *Sunbury*, supra, 216 Conn. 676, both of which make crystal clear that marital assets should be valued as of the dissolution date. If this state is to move to a "flexible approach" pursuant to which courts can select the valuation date, that is a decision for the legislature, not this court. Second, the majority suggests that I am overreacting because trial courts wrestle with these types of issues all the time. See footnote 28 of the majority opinion. In response, I simply note that, in my view, it is unacceptable for this court to issue an

---

[20] The events described in footnote 15 of the majority opinion are perfectly consistent with this observation.

opinion that essentially is a quagmire and to expect that the trial court will "sort it out" on remand.[21]

In closing, I note that the majority is able to reach its decision today only by systematically disregarding the amply supported facts found by the trial court, the strictures of our rules of practice, our well settled law regarding proof of fraud and our long-standing rule that we do not allow plaintiffs to advance claims on appeal that have not been fairly raised or preserved at trial. The majority's actions, in my view, are unwarranted even under the guise of "doing justice," which is the only motivation that I can charitably attribute to the majority opinion. The unfortunate irony is that it fails to accomplish even that goal.

For all of the foregoing reasons, I dissent.

---

[21] The majority, in footnote 28 of its opinion, fails to explain with cases, statutes and rules of practice what valuation date the trial court must use on remand.