LESLIE A. CAFFYN *vs.* BRIAN E. CAFFYN.

No. 06-P-687.

Norfolk. March 6, 2007. - August 31, 2007.

Present: COHEN, MILLS, & KATZMANN, JJ.

*Divorce and Separation,* Division of property.

In divorce proceedings in which the main issue at trial was the valuation of the parties' business assets, the judge acted within her discretion in denying the wife's posttrial motion seeking an order restraining her husband from interfering with the sale of certain of those assets, where the wife's claim of potential monetary loss was insufficient to establish irreparable harm [42]; further, the judge did not abuse her discretion in denying the wife's remaining posttrial motions, which sought to reopen the case so that later events could be taken into account in determining the value of certain business assets, where there was nothing to suggest that the valuation that was made on the basis of the evidence at trial, according to the usual practice under State law, was manifestly unjust or tainted by any fraud or concealment [42-45].

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on October 15, 2002.

The case was heard by *Angela M. Ordoñez,* J., and postjudgment motions were also heard by her.

*Paul M. Kane* for Leslie A. Caffyn.

*Robert J. Kates* for Brian E. Caffyn.

COHEN, J. On October 15, 2002, the plaintiff, Leslie A. Caffyn (wife), filed a complaint for divorce against the defendant, Brian E. Caffyn (husband), to whom she had been married since May 30, 1987. Following an interlocutory appeal on the issue of subject matter jurisdiction, see *Caffyn* v. *Caffyn,* 441 Mass. 487 (2004), a trial was held on May 18, 19, and 20, 2005. The current appeal by the wife is from the judgment of divorce, as amended, and, more particularly, the trial judge's denial of three posttrial motions.

*Background.* Because the parties entered into several stipulations prior to trial, including a stipulation that provided for an equal division of the marital estate,[1] the trial primarily concerned the valuation of the parties' business assets. To establish the value of these assets, the wife called the husband to testify, which he did over the course of two and one-half days. As the trial judge found, "the [h]usband had complete knowledge and command of every aspect of the business entities." The wife testified only to the existence of an irretrievable breakdown of the marriage, calling no other witnesses and presenting no independent testimony, expert or otherwise, on the value of the business assets. The husband called no witnesses.[2] Ultimately, in determining the value of the business assets, the judge credited some, but not all of the husband's testimony. The pertinent findings, supplemented by other relevant, uncontested evidence, may be summarized as follows.

The husband is a successful wind energy entrepreneur. In 1995, the husband was working for Cannon Power (Cannon), a company that develops, owns, and operates wind energy projects. He and a colleague, James Houston, then left Cannon to form a new limited partnership called UPC International CV (CV1), which owned Italian wind energy development rights purchased from Cannon. The limited partnership interest in CV1 was held by Wind City, Inc. (Wind City), a Delaware Subchapter S corporation formed by the husband, the sole shareholders of which were the husband and wife.[3] Houston's company, UPC International, NV (NV), was the general partner. In 1999, the husband and Houston formed a second limited partnership, UPC International Partnership CV2 (CV2). Again, Wind City was the limited partner, and NV was the general

---

[1]The parties also entered into stipulations regarding the value of their real estate, a parenting plan for their two children, the amount of child support, and the waiver of alimony.

[2]A motion in limine was granted midtrial to exclude the testimony of a potential witness for the husband.

[3]As stipulated by the parties, even though the husband owned ninety percent of the shares of Wind City and the wife ten percent, this asset was to be divided equally. The parties also had other business holdings, but their valuation is not contested on appeal.

partner. CV2 purchased the assets held by CV1 with a $25 million note.[4]

The husband testified that CV2 had a total arithmetic value of $240,840,000, but that after the deduction of an outstanding loan and various expenses, CV2's value was $226,560,000. He further testified that Wind City held a 31.57% interest in CV2, which, according to him, was worth $47,860,000, taking into account taxes and "lack of marketability" due to Wind City's minority position.[5]

In addition to stating his opinion of the over-all value of Wind City's interest in CV2, the husband also testified about three specific, pending transactions involving the following wind energy projects in which CV2 held an interest: Italian Vento Power Corporation, SRL (IVPC); IVPC Energy 4 BV (IVPC4); IVPC 6 SRL (IVPC6); and IVPC 2000 SRL (IVPC2000). First, the husband testified that, in early March, 2005, he signed a memorandum of understanding (MOU) on behalf of Wind City with a company called FIP regarding the sale of CV2's interest in IVPC for $37.5 million, of which $9,375,000 would have been Wind City's share.[6] However, the husband also testified that he did not consider the MOU in his valuation of IVPC because the MOU had expired.

Second, the husband testified that, around the same time, he signed another MOU with a company called Matrix with respect to the sale of IVPC6 and IVPC2000. The total purchase price for both entities was $160 million, of which $64,870,000 would have been apportioned to Wind City.[7] Again, the husband testified that he did not consider this MOU when valuing IVPC6 and IVPC2000 because the sale negotiations — with a company that had not previously purchased similar assets — were

---

[4]At the time of trial, the note was the only asset held by CV1. As described below, CV2's assets included interests in a number of Italian wind energy projects.

[5]The husband gave his estimates in both United States dollars and euros. Like the trial judge, we refer only to the figures given in United States dollars, for the sake of simplicity.

[6]The husband had valued IVPC at $31,010,000 — with Wind City's interest being $7,752,500.

[7]The husband had valued these entities at $98,650,000 — with Wind City's interest being $39,729,840.

"preliminary in nature," and due diligence conditions had not yet been satisfied. Moreover, this MOU, too, had expired.

Third, the husband testified regarding a pending lease transaction involving IVPC4, a 301-megawatt wind energy project company operating in southern Italy. At the time of trial, IVPC4 was a party to an agreement providing for the lease of the right to operate its turbines and other contractual rights associated with the operation of the turbines. The husband characterized the deal as "preliminary," although one of the four payments due under the lease already had been paid as of the date of trial. The husband testified that approximately $65 million would be available for distribution out of the payment that already had been made, of which Wind City would be entitled to thirty percent.[8] The husband also testified that he did not consider any of these pending transactions in valuing Wind City because he would not allow these deals to be finalized unless he and Houston entered into an agreement that would provide for the husband's buyout of Houston's interest in CV2.

The trial judge found that the husband's stated valuation of the four wind energy projects was not credible. Instead, she used the prices stated in the MOUs and the "prepayment" already received under the preliminary lease agreement for IVPC4 in computing the value of the entities.[9] By doing so, she reached the conclusion that Wind City's interest in CV2's assets was worth $94,132,500. In explaining her decision, the trial judge stated that she did not believe that the pending transactions were, in fact, contingent upon Houston's acquiescence to a buyout by the husband; but, regardless of the likelihood that these transactions would be completed, they were relevant to valuing Wind City's interest in CV2's assets because "fair market value" is "the highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market," *Epstein* v. *Boston Hous. Authy.*, 317 Mass. 297, 299 (1944), quoting from *Commissioner of Corps. & Taxn.* v. *Worcester County Trust Co.*, 305 Mass. 460,

[8]The husband had valued IVPC4 at $110,930,000, discounted by fifteen percent "over the life of the turbines."

[9]The three payments remaining under the lease were characterized as future income.

462 (1940), and these values represented the actual "negotiated price a willing buyer has negotiated and agreed to pay for these assets." The trial judge also noted that "the [h]usband testified that he believed that the purchase price negotiated for these assets was fair and reasonable."

The judge ultimately found that the pretax value of all of the parties' business assets, including Wind City and its holdings, was $98,752,500, which she reduced to $83,939,625 after applying a fifteen percent capital gains tax. The divorce judgment therefore provided that each party receive $41,969,812.50, as his or her fifty percent share of the business assets.[10]

*Posttrial motions.* After trial, the wife filed the three motions which form the procedural basis for her appeal: (1) an emergency motion for a temporary restraining order; (2) a motion to reopen evidence or in the alternative for a new trial; and (3) a motion for an evidentiary hearing regarding the value of the marital estate.

The emergency motion for a temporary restraining order was filed on June 21, 2005, one month after the trial was completed, but before entry of judgment. In that motion, the wife sought an order restraining the husband from "interfering with the sale" of certain business assets. The motion was accompanied by an affidavit from Houston, asserting, essentially, that it was his intention to dissolve the limited partnerships (CV1 and CV2), that he intended to "try and complete" the pending transactions to which the husband had testified, and that all remaining assets would "be offered for sale on an arms length, fair market value basis, to third parties." The motion was denied on July 7, 2005, on the ground that the wife had not shown that she was entitled to a temporary restraining order where she alleged only potential financial harm. The judge further observed that even if the motion were construed as a motion to reopen the evidence, the wife still would not be entitled to relief because she knew of

---

[10]Division was to be effectuated by cash payment, with the wife retaining no equity in the business assets. The judge ordered that the husband make an equalization payment to the wife, either in full or in five interest-bearing instalments, as he elected; and that the wife release and transfer her interests in the business assets to the husband within thirty days of the divorce judgment. The judge later amended the judgment to permit the wife to secure the equalization payment by delaying the release and transfer of her interest in Wind City until seven days after the husband's payment in full.

Houston's existence, chose not to call him to testify, and thus the information contained in his affidavit was not "newly discovered."

On September 22, 2005, still prior to the entry of judgment, the wife filed her "motion to reopen evidence or in the alternative for a new trial," requesting that the court hear evidence regarding the pending liquidation of CV1 and CV2. As reflected by the court's later actions, this motion effectively was denied. On October 7, 2005, judgment of divorce nisi entered.[11] Then, on November 16, 2005, the wife filed her motion for an evidentiary hearing regarding the value of the marital estate,[12] which motion also was denied, on December 7, 2005.

*Discussion.* The denial of the wife's motion for a temporary restraining order requires little discussion. Suffice it to say that the trial judge acted within her discretion in concluding that injunctive relief was not warranted, if only because the wife's claim of potential monetary loss was insufficient to establish irreparable harm. See *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.*, 399 Mass. 640, 643 (1987). See also *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 621 (1980).

The heart of the wife's appeal is the judge's denial of the remaining two motions — the prejudgment motion to reopen evidence or in the alternative for a new trial, and the postjudgment motion for an evidentiary hearing regarding the value of the marital estate. Essentially, the wife contends that, after the conclusion of the trial, the judge should have reopened the case so that subsequent events could be taken into account in determining the value of Wind City. Although raised by way of two different motions, the central legal question is the same. We must consider whether it was an abuse of discretion for the judge to fix the value of the marital assets as of the time of trial and on the basis of the evidence at trial, when, according to the wife, evidence of

[11]The judgment was twice amended, on December 7, 2005, and on March 10, 2006. Neither amendment changed the valuation of the marital estate in any way relevant to this appeal.

[12]The wife's arguments in support of this motion reveal that she no longer had reason to fear that the husband would interfere with the sale of CV2 assets. She now was concerned that the sales would generate net proceeds in excess of the values placed on these assets by the trial judge.

the later liquidation of CV2's assets would have taken "the guess work out of the issue of valuation."

Although some States have established that marital property is to be valued as of a particular date (e.g., the date of separation, the date of filing of the divorce complaint, or the date of trial), Massachusetts has adopted a more flexible approach. See 2A Kindregan & Inker, Family Law & Practice § 45:3 (3d ed. 2002). Under Massachusetts law, "the marital estate is typically determined as of the date of the divorce trial." *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 154 (1996). However, the trial "judge has the discretion to make that determination at another date when warranted by the circumstances of a particular case." *Ibid.* Thus, for example, where the wife was found to have made no contribution to the marital estate subsequent to the date of separation, it was within the judge's discretion to value the estate as of the date of separation, rather than the date of trial. *Savides* v. *Savides*, 400 Mass. 250, 253 (1987).

In the present case, "the judge did not abuse [her] discretion in adhering to the usual practice of valuing the assets of the parties at the time of the hearing." *Moriarty* v. *Stone, supra* at 155. It is not uncommon for posttrial events to change the value of a marital asset. See *Sahin* v. *Sahin*, 435 Mass. 396 (2001), for an extreme example. However, that alone does not mean that the issue of valuation must be considered and decided anew. See *Robbins* v. *Robbins*, 16 Mass. App. Ct. 576, 580-581 (1983) (no abuse of discretion in denying wife's posttrial requests to revisit value of husband's business asset in light of favorable tax settlement entered into after trial). Here, even if there was evidence to support the conclusion that the value of the parties' business assets changed after the conclusion of the trial, the judge was entitled to adhere to the date of trial as the appropriate valuation date.

That is not the end of the inquiry, however, because the wife also may be understood to argue that the trial judge should have considered evidence of later developments in order to more accurately compute the value of Wind City as of the date of trial. To be sure, the trial judge had the inherent power to reopen the matter, to take additional evidence, and to reconsider her decision; however, the exercise of that power was committed to her

discretion, see *Franchi* v. *Stella*, 42 Mass. App. Ct. 251, 258 (1997), and was not required in the absence of a manifest injustice. See *Spiller* v. *Metropolitan Transit Authy.*, 348 Mass. 576, 580 (1965).

In the present case, we think that the judge had ample reason to decline to permit the wife to present additional proof on the issue of valuation. Among other things, the judge could consider the interests of the court and the husband in bringing to closure a matter that already had been tried to a conclusion with both parties represented by able counsel; the wife's presumably strategic decision to rely upon the husband's testimony and to forgo expert testimony as to the value of the relevant business entities under alternative scenarios, including liquidation; and the wife's failure to make a persuasive showing that the later transactions were substantially different from those explained in the husband's testimony and relied upon by the judge.

The Connecticut case of *Weinstein* v. *Weinstein*, 275 Conn. 671 (2005), relied upon by the wife, does not lead us to a different conclusion. Unlike Massachusetts law, Connecticut law provides that "[w]ith respect to dissolution proceedings, . . . the value of the parties' assets must be determined as of the time the judgment of dissolution is rendered" and that, therefore, "the duty to update pertinent discovery responses and to disclose facts relevant to that determination necessarily must extend until the judgment is rendered." *Id.* at 697.[13] As we have discussed above, the usual practice in Massachusetts is to value the marital estate as of the date of trial. That being so, once the trial was completed, the husband was not required to update discovery and disclose additional information potentially affecting the future value of the business assets.

Even more importantly, unlike the situation in *Weinstein*, the wife in the present case made no showing that the husband had engaged in fraud. In *Weinstein*, it was found that the husband deliberately misrepresented the value of a business interest in the sworn financial statement filed in connection with the dis-

[13]At issue in the *Weinstein* case was whether the husband's postjudgment motion for reconsideration extended the posttrial duty to disclose information pertaining to value.

solution trial. *Id.* at 688-691.[14] Here, although the husband placed a lower value on CV2's holdings than was reflected by various offers received for those holdings, he also fully disclosed the nature and amount of those offers, which then provided the basis for the higher valuation found by the judge. As the judge noted, the wife even admitted in her motion for an evidentiary hearing that, as of the close of the evidence, the husband had no information regarding the liquidation of the partnership holdings. Thus, there is nothing to suggest that the valuation that was made on the basis of the evidence at trial was tainted by any fraud or concealment.

*Conclusion.* For the foregoing reasons, the second amended judgment of divorce, and the judge's orders denying the wife's posttrial motions for a temporary restraining order, to reopen the evidence, and for an evidentiary hearing, are affirmed.

*So ordered.*

.

---

[14]In *Weinstein* v. *Weinstein, supra* at 676, the husband's financial statement indicated that his interest in a business was worth only $40,000. Approximately one month after trial, and before his motion for reconsideration was decided, the husband and his partners rejected an offer to buy the business for $2.5 million, "in part because they believed it was too low." *Id.* at 677. The existence of this offer was not disclosed to the court, and five months after the entry of the judgment of dissolution, the business was sold for $6 million, of which the husband received approximately $1.45 million. *Ibid.*